784 So.2d 627 (2001)
Edward MARTIN, et al.
v.
HERITAGE MANOR SOUTH, et al.
No. 2000-CC-1023.
Supreme Court of Louisiana.
April 3, 2001.
*629 James A. Bolen, Jr., Eric J. Miller, Alexandria, Counsel for Applicant.
Ander M. Boggs, Bossier City, Counsel for Respondent.
VICTORY, J.
At issue in this case is whether the trial court abused its discretion in granting plaintiffs' motion for new trial on the ground that the jury's verdict for defendant was contrary to the law and the evidence. After reviewing the record and the applicable law, we find that the trial court abused its discretion in granting the motion for new trial, and we therefore reverse that ruling, and reinstate the jury verdict in favor of defendant.

FACTS AND PROCEDURAL HISTORY
Edward and Marvin Martin ("plaintiffs") filed suit against Heritage Manor South Nursing Home ("Heritage Manor") alleging that the negligent care provided to their mother, Frances Martin ("Mrs. Martin"), while she was a resident at Heritage Manor, caused her to develop a decubitus ulcer on her buttocks and later, an infection of that ulcer, which caused her death. After a four-day jury trial, the jury returned a verdict in favor of Heritage Manor, finding that Heritage Manor was negligent, but that its negligence was not a cause-in-fact of the death of Mrs. Martin. A judgment to that effect was signed by Judge John Mosely on October 21, 1999. From this judgment, plaintiffs moved for a judgment notwithstanding the verdict ("JNOV") and new trial. Defendant also moved for a JNOV with respect to that portion of the jury's verdict which held that Heritage Manor was negligent.
The trial judge denied both parties' JNOV motions[1], but granted plaintiffs' motion for new trial, finding that a new trial was warranted under La. C.C.P. art. 1972 "because the jury's verdict is contrary to the law and the evidence." The court of appeal denied defendant's writ, finding that "[u]pon the showing made, the exercise *630 of this Court's supervisory jurisdiction is not warranted." Edward Martin, et al. v. Heritage Manor South, et al, 33797-CW (La.App. 2 Cir. 3/10/00), ___ So.2d ___. We granted defendant's writ to consider whether the trial court abused its discretion in granting plaintiffs' motion for new trial. Martin v. Heritage Manor South, 00-1023 (La.6/16/00), 763 So.2d 611.[2]

DISCUSSION
La. C.C.P. art. 1972 provides:
A new trial shall be granted, upon contradictory motion of any party, in the following cases:
(1) When the verdict or judgment appears clearly contrary to the law and the evidence.
(2) When the party has discovered, since the trial, evidence important to the cause, which he could not, with due diligence, have obtained before or during the trial.
(3) When the jury was bribed or has behaved improperly so that impartial justice has not been done.
In the instant case, the trial judge based his ruling solely on La. C.C.P. art. 1972(1), finding that the verdict was contrary to the law and the evidence. However, the parties indicated at oral argument before this Court that the verdict was not contrary to the law, so we will focus our inquiry on whether the law was contrary to the evidence.
Although the granting of a new trial is mandatory if the trial court finds that the verdict is contrary to the law and evidence under La. C.C.P. art. 1972, the jurisprudence interpreting the provision recognizes the trial judge's discretion in determining whether the evidence is contrary to the law and evidence. As this Court has stated, the decision of "[w]hether to grant a new trial requires a discretionary balancing of many factors." Davis v. Wal-Mart Stores, Inc., 00-0445 (La.11/28/00), 774 So.2d 84 (citing Gibson v. Bossier City General Hospital, 594 So.2d 1332 (La.App. 2 Cir.1991)). In Davis, we explained:
[a]lthough the granting or denying of a motion for new trial rests within the wide discretion of the trial court, the discretion of the court is limited:
The fact that a determination on a motion for new trial involves judicial discretion, however, does not imply that the trial court can freely interfere with any verdict with which it disagrees. The discretionary power to grant a new trial must be exercised with considerable caution, for a successful litigant is entitled to the benefits of a favorable jury verdict. Fact finding is the province of the jury, and the trial court must not overstep its duty in overseeing the administration of justice and unnecessarily usurp the jury's responsibility. A motion for new trial solely on the basis of being contrary to the evidence is directed squarely at the accuracy of the jury's factual determinations and must be viewed in that light. Thus, the jury's *631 verdict should not be set aside if it is supportable by any fair interpretation of the evidence. Gibson v. Bossier City General Hospital, et al., supra. See also Engolia v. Allain, 625 So.2d 723 (La.App. 1 Cir.1993). (Emphasis added.)
Davis, supra, op. at p. 10, 774 So.2d at 93. In considering a motion for new trial under La. C.C.P. art. 1972, "the trial court may evaluate the evidence without favoring either party; it may draw its own inferences and conclusions; and evaluate witness credibility to determine whether the jury had erred in giving too much credence to an unreliable witness." Joseph v. Broussard Rice Mill, Inc., 00-0628 (La.10/30/00), 772 So.2d 94 (citing Smith v. American Indem. Ins. Co., 598 So.2d 486 (La.App. 2 Cir.), writ denied, 600 So.2d 685 (La.1992)). However, this does not mean that the trial judge can usurp the jury's fact-finding role.
A motion for a new trial requires a less stringent test than for a JNOV[3] as such a determination involves only a new trial and does not deprive the parties of their right to have all disputed issues resolved by a jury. Id.[4] "Although the language is similar between the standards for a JNOV and new trial, there is a real difference between a finding that no evidence existed for a rational jury to reach a particular result and a finding that a jury could not have reached its conclusion on any fair interpretation of the evidence." Gibson, supra at 1336. Notably, in considering whether the verdict was supported by any "fair interpretation of the evidence" on a motion for new trial, the trial judge is free to weigh the evidence and make credibility determinations, and is not required to view the evidence in the light most favorable to the non-movant as on a JNOV motion.
In addition, as opposed to the granting of a motion for new trial on the grounds that the verdict is contrary to the evidence, which is directed squarely at the *632 accuracy of the jury's factual determinations, noted federal procedural law commentators have stated that "whether the evidence presented at trial is sufficient to create an issue of fact for the jury or will permit the court to enter a judgment as a matter of law[5] is solely a question of law." Charles Alan Wright and Arthur R. Miller, Federal Practice and Procedure, Vol. 9A, § 2524, p. 249 (West 1995). These commentators have further explained the differences between motions for a judgment as a matter of law and a new trial in that, while the trial judge has great discretion to determine whether the verdict is contrary to the law or the evidence on a motion for new trial, "[o]n a judgment as a matter of law, [the trial judge] has no discretion whatsoever and considers only the question of law whether there is sufficient evidence to raise a jury issue." Id., § 2531, p. 302. These same differences exist between a motion for a JNOV and a new trial under Louisiana law.[6]
Having reviewed the standard for granting or denying a motion for new trial, and considering the differences between that standard and the standard for granting a JNOV, we now turn to the standard of review. The applicable standard of review in ruling on a motion for new trial is whether the trial court abused its discretion. Joseph, supra at p. 15, 772 So.2d at 104-05 (citing Anthony v. Davis Lumber, 629 So.2d 329 (La.1993)); Davis, supra at p. 10, 774 So.2d at 93 (citing Wyatt v. Red Stick Services, Inc., 97-1345 (La.App. 3 Cir. 4/1/98), 711 So.2d 745); see also La. C.C.P. art. 1971, Official Revision Comment (d) ("Although the trial court has much discretion regarding applications for new trial, in a case of manifest abuse the appellate court will not hesitate to set the trial court's ruling aside, or grant a new trial when timely applied for").[7]
Although the standard of review is clear, the application of that standard is not so easy. See Davis, supra (Concurring Opinion of Justice Lemmon). In Davis, we noted that in reviewing a ruling on a motion for new trial, "we are faced with the balancing of two very important concepts: the great deference given to the jury in its fact finding role and the great discretion given to the trial court in deciding whether to grant a new trial." Davis, supra at 11, 774 So.2d at 93-94. "The scales are clearly tilted in favor of the survival of the jury's verdict, but the trial court is left with a breadth of discretion which varies with the facts and events of each case." Id.
In this case, the trial court's reasons for judgment granting the new trial motion stated only that "the jury's verdict *633 is contrary to the law and the evidence." Because the trial judge gave no reasons why he ruled that the jury's verdict was contrary to the law and the evidence, it is more difficult to determine if he abused his discretion in so ruling. A ruling that simply says "a new trial is warranted because the jury's verdict is contrary to the law and the evidence," gives no guidance to the appellate court as to the trial judge's reasoning in granting a new trial and requires the appellate court in its record review to determine what evidence or what law the trial court thought the verdict was contrary. In granting a new trial, it would be helpful for the trial court to state specific reasons for its ruling, which would greatly simplify and assist the review process. This is particularly true where the trial judge finds the verdict is contrary to the law or the evidence.
Because the trial judge gave no specific reasons why he determined that the jury verdict was contrary to the evidence, we must examine all the evidence to determine whether the trial judge abused his discretion. As previously stated, the jury found that Heritage Manor was negligent but that its negligence was not a cause-in-fact of Frances Martin's death. Therefore, in reviewing the evidence presented at trial, we will focus on the jury finding that Heritage Manor's negligence, as determined by the jury, did not cause Frances Martin's death.[8]
Frances Martin was 87 years old at the time of her death on July 22, 1996. She had been a resident at Heritage Manor since 1988 without complaint, problem, or incident. She visited her doctor, Dr. James May, at his office during this time every few months and had last visited him on May 30, 1996, with no problems on her buttocks. Mrs. Martin's daughter-in-law, Sheila Martin, testified that she noticed a red, whelping, and oozing bed sore on Mrs. Martin's right buttock on either June 24 or 25, 1996, and notified the nurse.
The nursing home notes from June 26, 1996, indicate that the nurse saw a large reddened area on Mrs. Martin's right buttock, that looked like nail scratches and was warm to the touch. The nursing home ordered a culture and sensitivity test on June 26. The nurses noted a scant amount of purulence on June 27. Marlene Adare, the wound care nurse at Heritage Manor, testified that she called Dr. May's office three times on June 27 and 28 to notify him of Mrs. Martin's condition. Dr. May did not return her calls until June 28, and at that time he approved of the culture and sensitivity test and ordered the application of Bactroban, an antibiotic cream. At 2:40 p.m. on June 28, the lab called Heritage Manor with the results of the culture and sensitivity test, indicating that Mrs. Martin had a Methicillin Resistance Staphylococcus Aureus infection ("MRSA" infection), which is a contagious bacterial skin infection.[9] Ms. Adare told the lab to fax the results to Dr. May's office, which they did. Mrs. Martin was placed in a new room with another patient who had the same type of infection. However, because Dr. May's office hours ended at noon on June 28, he did not see these results until he returned to the office on Monday, July 1, 1996.
On June 29, Romel Jack, the nurse who cared for Mrs. Martin that day, noted that she applied Bactroban to the right buttock and that it was very red and warm to the touch, that she was kept clean and dry and *634 turned every two hours. The next notes from that date indicate that Bactroban was applied again, the wound remained red and warm to the touch, her temperature was 99.8, and she was forced fluids and ate half of her meal. At 10:45 p.m., her temperature was 98, Bactroban was applied and she was kept clean and dry. Another nurse at Heritage Manor, Janis Whitten, testified that she cared for Mrs. Martin on June 30 from 7:00 a.m. to 3:00 p.m. She noted that at 2:00, Mrs. Martin was under no apparent distress, her temperature was 97.7, and she drank fluids without difficulty.
When Dr. May returned to the office on July, 1, he testified that he saw the message from Heritage Manor and called Dr. Reilly, who visited patients in Heritage Manor, so that Dr. Reilly could visit Mrs. Martin but could not reach him. Heritage Manor also called Dr. Reilly. Dr. Reilly returned the call at 5:15 p.m. and told them to call Dr. May, which they did. Heritage Manor also called Mrs. Martin's family at 5:30 p.m., and they agreed that Mrs. Martin should go to the hospital. At that time, her temperature was 99.8. Dr. May testified that he ordered that she be transferred to Willis-Knighton Hospital that afternoon.
Dr. May testified on cross-examination that he signed her discharge summary, which was dated July 6, and that the discharge summary was filled out by Heritage Manor. The discharge summary listed her condition on discharge as follows: buttocks red and swollen with a small pustule; lab results on June 26 showed MRSA; incontinent bowel and bladder, decreased LOC, decreased appetite, general weakness, hypertension, UTA, congestive heart failure, depression disorder. However, he testified her condition on discharge was not due to poor nursing home care.
Upon admittance to the emergency room at Willis-Knighton on July 1, Mrs. Martin's Admission Assessment indicated a "red, hard and hot sore on r buttock Dng Yellow Fld." Dr. Patrick Gallagher first examined her and his notes indicate that she presented with major, multiple, open, draining wounds with surrounding redness and a fluid filled blister on her right buttock. Further, she had a urinary tract infection and was dehydrated. Nurse Ed Bintrop also examined Mrs. Martin when she arrived at the ER and his notes indicate that she had wounds to both buttocks that were 0.2 to 0.6 centimeters in diameter (about the size of the head of a pencil) and that her right buttock tissue was reddened, hot to the touch, tight, and with weeping discharge, and noted a quarter-sized fluid-filled blister on her right hip. Although he did not call it a decubitus ulcer[10] in his contemporaneous notes, he testified that it was a Stage 3 decubitus ulcer, but that he had seen such ulcers develop in 2-3 hours, depending on the nutritional condition of the patient, her bed care and the amount of mobility.
Dr. Kirit Patel testified that he saw Mrs. Martin later on July 1 and that she was in critical condition, with multiple organ failure due to wound infection/sepsis, poor *635 nutrition, pulmonary disease, uncontrolled diabetes, renal failure, and chronic heart disease. He noted that she had severe cellutis on her buttocks, which is a sign of inflammation. He noted her condition at the time of admittance as critical and her prognosis as poor. He was also the doctor who signed her death certificate which listed the causes of death as cardiac failure, respiratory failure, pneumonia, wound infection/sepsis and malnutrition. He testified that the wound infection was the cause of all these problems and that "the cause of the wound was the breakdown in the skin tissue leading to contamination of the bacteria in the surrounding environment which probably entered into her soft tissues including the skin and subsequently led to her demise." However, he testified that this can happen even with the best of care and that he did not think that the sepsis developed due to any fault on the part of Dr. May or Heritage Manor.
Plaintiffs also presented the testimony of Dr. James McDonald, a plastic surgeon in the Shreveport, who was accepted without objection as an expert in plastic surgery with particular emphasis on decubitus ulcer treatment. He testified that at the time of trial, he saw one-two decubitus patients per year, although in years past he had seen more. Dr. McDonald testified that the initiating cause of her multi-system failure and death was her infection from her severe bed sore. He testified that from viewing a photograph of Mrs. Martin's wound on July 8, the day of her debridement surgery, he felt that the condition had been developing for three weeks. He testified, however, that if the evidence showed the wound was not over a bony prominence, then it would not have been a decubitus ulcer, and he had no indication that the developing infection at Heritage Manor was over a bony prominence. He testified that, in general, precautions need to be taken to prevent bed sores, but it depends on the condition and mobility of the individual patient.
Plaintiffs also called Cindy St. Amant, who was a director of nursing at Heritage Manor in 1995 and 1996. She testified as an adverse witness on cross-examination by plaintiff that it was below the standard of care for Heritage Manor not to use anti-pressure devices, special positioning with support pillows, and a turning program with Mrs. Martin and that Heritage Manor should have called a doctor on June 26 when the culture was first taken. Plaintiffs also called Dominique Jewit as an expert in nursing home care. She testified that the care provided by Heritage Manor was below the standard of care and that Mrs. Martin would not have this pressure sore if Heritage Manor would have used anti-pressure devices and support pillows, exercised her joints, provided proper nutrition, and treated her incontinence. She also expressed her view that Heritage Manor was negligent in not taking Mrs. Martin to the hospital on June 28, when they were unable to reach Dr. May. Finally, plaintiffs called Julie White, a nurse at Heritage Manor in 1996, who testified that while she was employed there, she did not remember any of the nurses using any of the recommended preventative measures for bed sores, namely, support pillows, joint exercises, skin care lotions, or evaluation of nutrition and fluid intake needs or incontinence problems.
Defendant presented the expert testimony of Dr. Barron Johns O'Neal, a plastic and reconstructive surgeon who had been practicing in the Shreveport area for 15 years, had written numerous articles about pressure sores and decubitus ulcers, and who testified that he was considered the "decubitus doctor" in the medical community. He further testified that he saw three to four new cases of decubitus ulcers each week. Dr. O'Neal's opinion was that *636 Mrs. Martin did not have a decubitus ulcer when she was admitted into the hospital because the wound was not over a bony prominence. The wound she developed at Heritage Manor was a gradually enlarging infection that was not caused by the care provided by Heritage Manor, and that diabetes would make the infection progress faster. He testified that she did not develop the decubitus ulcer until July 3, after a nurse at the hospital noted a breakdown in the sacral area, which is over a bony prominence. Dr. O'Neal further testified that the sepsis that caused her death could have been caused by the wound infection, her urinary tract infection, or pneumonia. Because of her old age and failing health, she could not fight these infections and that nothing the nursing home could have done would have prevented her death. He testified that it was not below the standard of care for Heritage Manor not to have taken Mrs. Martin to the hospital before July 1.
Defendant also called Susan Temple as an expert in nursing care standards who testified that Heritage Manor did not breach any standards of nursing care in their treatment of Mrs. Martin. Heritage Manor's administrator testified that every resident had an egg crate built into their mattress, and that part of Mrs. Martin's care plan was to turn her regularly when she was in bed. She testified that Mrs. Martin was mobile, could walk around, and could reposition herself. She also testified that Mrs. Martin's family was called on the afternoon of June 28 and told that she was being transferred to another room because of the MRSA infection. Similarly, Ms. Adare, the wound care nurse at Heritage Manor, testified that saw no need for any special anti-pressure devices on Mrs. Martin because she was mobile until the very end when she was taken to the hospital. She testified that the nursing home needs a doctor's order to begin treating a wound and that Dr. May did not return her calls made to him on June 27 until June 28, at which time he ordered the application of Bactroban.
Plaintiffs argue that the jury's verdict that any negligence on the part of Heritage Manor was not a cause in fact of Mrs. Martin's death is contrary to the evidence because the death certificate showed that "wound infection/sepsis" was the cause of death and this resulted from the bed sore Mrs. Martin acquired while at Heritage Manor. However, the jury clearly could have believed the testimony of Dr. O'Neal, who testified that the gradually enlarging infection that Mrs. Martin developed at Heritage Manor did not become a decubitus ulcer because it was not over a bony prominence, that Mrs. Martin did not have the decubitus ulcer when she entered the hospital, and that she did not develop the decubitus ulcer until July 3. The jury also could have credited Dr. O'Neal's testimony that the sepsis could also have resulted from her urinary tract infection or from pneumonia.
Further, the jury could have also accepted Dr. May's testimony that Mrs. Martin's condition on discharge from Heritage Manor was not due to poor nursing home care, and Dr. Patel and Dr. O'Neal's testimony that her death was not caused by any fault on the part of Heritage Manor. The jury surely could have reached the conclusion based on a fair interpretation of the evidence that Mrs. Martin would have died even with the best of care, given her advanced age compounded with her other health problems. While the trial judge does have discretion in granting a new trial and is entitled to draw his own inferences and conclusions from the evidence and evaluate witness credibility to determine whether the jury erred in giving too much credit to an unreliable witness, he may not interfere with a jury verdict with *637 which he simply disagrees when that verdict is based on a fair interpretation of the evidence. In this case, the jury verdict was based on the testimonies of several highly qualified physicians, Dr. May, Mrs. Martin's treating physician, as well as Dr. Patel, an internal medicine and critical care physician, and Dr. O'Neal, a highly qualified specialist who handles cases of decubitus ulcers on a daily basis. We find that the trial judge abused his discretion in granting a new trial on the grounds that the jury verdict was contrary to the law and the evidence, as the jury's verdict was clearly based on a fair interpretation of the evidence.

CONCLUSION
The granting or denying of a motion for new trial rests within the discretion of the trial court, however, that discretion is not without limits. While a trial judge may evaluate the evidence without favoring either party, and draw its own inferences and conclusions and evaluate witness credibility to determine whether the jury erred in giving too much credence to an unreliable witness, the trial judge cannot interfere with any verdict with which he or she disagrees. Particularly, a jury verdict cannot be set aside on that the grounds that the verdict is contrary to the evidence if it is supportable by any fair interpretation of the evidence. Further, when a trial judge grants a new trial on the grounds that the jury verdict is contrary to the law and the evidence, it would be helpful if he would set out the specific reasons for his finding, including the specific evidence or law to which he believes the verdict is contrary. The appellate court must then review the record in view of this evidence or law to determine whether the trial judge abused his discretion in granting the motion for new trial.
In this case, we find that it was an abuse of discretion for the trial court to grant a new trial, as the jury's verdict that Heritage Manor's negligence was not a cause-in-fact of Mrs. Martin's death was supportable by a fair interpretation of the evidence.

DECREE
For the reasons stated herein, we reverse the judgment of the trial court granting plaintiffs' motion for new trial and reinstate the jury verdict in favor of Heritage Manor.
REVERSED; JURY VERDICT REINSTATED.
NOTES
[1] In denying the JNOV motions, the court held that "the jury after weighing the evidence and argument of counsel and after instruction on the applicable law, the jury returned a verdict in favor of the defendant, while the Court may or may not have reached the same conclusion based on the evidence, the court cannot say that reasonable persons could not have reached the conclusion reached by the jury in this case."
[2] When an appellate court determines, under its supervisory jurisdiction, that a thorough review of the trial court's granting of a new trial under La.Code Civ. Proc. art.1972(1) as contrary to the law and evidence is appropriate, a transcript of the evidence generally is not available because no appeal has been taken from the judgment on the merits. The appellate court, in considering the application for supervisory writs that seeks a thorough review of the granting of a new trial, must first decide whether the writ application warrants ordering a transcript of the testimony (which is necessary for review of the evidence). After this Court took this first step in the present case and ordered the transcript, we were able to take the second step and review the evidence.
[3] In Joseph v. Broussard Rice Mill, supra, we discussed the standards for determining whether a JNOV is proper as follows:

La.Code Civ. Proc. Art. 1811 controls the use of JNOV. Although the article does not specify the grounds on which a trial judge may grant a JNOV, in Scott v. Hospital Serv. Dist. No. 1, 496 So.2d 270 (La.1986), we set forth the criteria used in determining when a JNOV is proper. As enunciated in Scott, a JNOV is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the trial court believes that reasonable persons could not arrive at a contrary verdict. The motion should be granted only when the evidence points so strongly in favor of the moving party that reasonable persons could not reach different conclusions, not merely when there is a preponderance of evidence for the mover. The motions should be denied if there is evidence opposed to the motion which is of such quality and weight that reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions. Scott, 496 So.2d at 274. In making this determination, the trial court should not evaluate the credibility of the witnesses, and all reasonable inferences or factual questions should be resolved in favor of the non-moving party. Anderson v. New Orleans Pub. Serv., Inc., 583 So.2d 829, 832 (La.1991). This rigorous standard is based upon the principle that "[w]hen there is a jury, the jury is the trier of fact." Scott, 496 So.2d at 273; Jinks v. Wright, 520 So.2d 792, 794 (La. App. 3 Cir.1987).
Op. at 4-5, 772 So.2d at 99; see also Davis, supra at 4-5, 774 So.2d at 89-90.
[4] "The important distinction between a JNOV and a judgment granting a new trial is that a JNOV reverses the jury's award and makes the apparent winner the loser, while a judgment granting a new trial merely erases the jury verdict (or trial court judgment) and puts the parties in the positions they occupied prior to trial." Frank L. Maraist and Harry T. Lemmon, Louisiana Civil Law Treatise, Volume 1, Civil Procedure, § 13.4, p. 353 (1999).
[5] In 1991, Fed.R.Civ.P. Rule 50 was amended to change the terminology from directed verdict and judgment notwithstanding the verdict to "judgment as a matter of law." Wright and Miller, Vol. 9A, p. 238, n. 3.
[6] This Court has previously looked to federal law for guidance in determining the standard for deciding a motion for JNOV because La. C.C.P. art. 1811 was modeled after the Federal Rules of Civil Procedure, Rule 50(B), (c), and (d). See Scott, supra at 273.
[7] The standard for reviewing a JNOV is the manifest error standard and was articulated in Davis, supra at p. 4-5, 774 So.2d at 89 as follows:

The standard of review for a JNOV on appeal is a two part inquiry. In reviewing a JNOV, the appellate court must first determine if the trial court erred in granting the JNOV. This is done by using the aforementioned criteria [see note 3, supra] just as the trial judge does in deciding whether of not to grant the motion. After determining that the trial court correctly applied its standard of review as to the jury verdict, the appellate court reviews the JNOV using the manifest error standard of review. Anderson v. New Orleans Public Service, Inc., at p. 832.
[8] As previously stated, the parties indicated at oral argument that the verdict was not contrary to the law.
[9] The medical testimony indicates that this type of infection should be treated with intravenous drugs.
[10] The various doctors' testimony indicates that a decubitus ulcer is a pressure sore which is caused when pressure cuts off circulation to the skin and underlying tissue and causes the tissue to die. The breakdown of the skin makes it susceptible to infection to the skin and underlying tissue. All the doctors testified that the problem can start as pinhole in size and the problem to the underlying tissue cannot readily be seen. Dr. James May testified that a decubitus ulcer is difficult to treat and requires nutritional support, positional change, local wound care, and, if there is an infection, the infection must also be treated.