J^MOORE, J.
Three defendants, Truman Arnold Companies, its employee Bruce Tidwell, and its insurer St. Paul Fire & Marine (collectively referred to as “TAC”), seek review of the district court’s ruling that granted a new trial to the plaintiff, Vamell Boylston. Finding merit in TAC’s position, we grant the writ and make it peremptory.

Factual and Procedural Background

The accident, a flash fire, occurred about 1:00 p.m. on December 6,1998, at a Pennz-Mart gas station on Jewella Road just north of 1-20 in Shreveport. Boylston, a night-shift employee of Red River Sani-tors, drove his daughter’s 1987 Pontiac Grand Am to the PennzMart to buy $4 of gas. He parked just to the north of the northmost fuel island, and then entered the store to pay for his gas; he also bought a cigar. While he was in the store, a gasoline tanker owner by TAC arrived to deliver fuel. The tanker parked between Boylston’s car and the fence on the north property line, only 5-10 feet from the car. The driver, Bruce Tidwell, testified that he saw the car parked there, but he had to park nearby because of close quarters and crowded conditions in the parking lot.[1]
Boylston returned to his car and pumped his gas; he then got in the car, with the driver’s door window open, and stuck the cigar in his mouth. Meanwhile, Tidwell did not unload any gas, as he was too close to a parked car. However, he opened the vapor release valve at the rear of the tanker and removed a dust cap from the belly valve on its side. He was crouching down to finish his preparations when he heard a woman scream near the | ¡front of the store. He looked over his shoulder and saw a “flame coming out * * * back there by the back of my trailer” and going toward the parked car. He hurried over to the car to find Boylston still in the driver’s seat, patting out flames on his clothes. Tidwell pulled him out, patted away the rest of the flames, and walked him to the front of the store.
Boylston testified that he quit smoking sometime in 1997 and was only getting the cigar for his nephew, but admitted that he put the wrapped cigar in his mouth. He insisted he did not try to light it; however, Tidwell testified that in the moments after the accident, Boylston twice told him he tried to light the cigar. Boylston testified *1258 that he was about to turn his ignition when he heard a loud boom! and suddenly saw fire everywhere. He sustained first and second degree burns to 16-17% of his body.
Captain Moon of the Shreveport Police Department investigated the fire, questioning Boylston at the LSU Burn Unit. Boylston told Capt. Moon that he “started to light” the cigar but had not done so when the fire came in through the open window. In the car, which had been towed to Boylston’s house, Capt. Moon found burn patterns in the interior on the driver’s side, consistent with flames coming in the window. He found no burn pattern on the outside. He took photos of the car, including an unwrapped Swisher Sweet cigar on the console. Subsequent experts had to rely exclusively on Capt. Moon’s photos because Boylston’s daughter sold the car for scrap and it could not be located.
Boylston filed this suit in November 1999 against TAC and Jack Pot Enterprises, the owner of the PennzMart, and its insurer. Boylston alleged Lthat all defendants were strictly liable for his damages. TAC filed a third party claim against Jack Pot, citing a hold harmless clause in their lease. After jury trial began in March 2002, Boylston dismissed his claims against Jack Pot and the district court severed TAC’s contract claim. The trial took four days. The jury, by a 9-3 vote, found that the negligence of TAC was not a cause in fact of the plaintiffs injuries.
Before the court rendered judgment in accord with the verdict, Boylston moved for JNOV or new trial. After a hearing on July 15, 2003, the court denied JNOV. However, stating that it had never done so before, and “after careful consideration and a lot of thought,” the court granted a new trial, because it “believes that the result was clearly contrary to the evidence, * * * against the manifest weight of the evidence, which was that the vapors came from the truck.” This writ application by TAC followed.
On initial hearing, a panel of this court peremptorily denied the application. Boylston v. Tidwell, 36,730 (La.App. 2 Cir. 10/23/02) (unpublished writ denial). TAC then sought review from the supreme court, which granted the writ and remanded the case for briefing, argument and a full opinion. Boylston v. Tidwell, 02-2872 (La.2/7/03), 841 So.2d 740.

Applicable Law

A new trial shall be granted, upon contradictory motion of any party, “when the verdict or judgment appears clearly contrary to the law and the evidence.” La. C.C.P. art.l972(l). Although the granting of a new trial under this provision is mandatory, the jurisprudence interpreting it recognizes the trial judge’s discretion in determining whether the evidence 14is contrary to the law and evidence. The decision to grant or deny a new trial “requires a discretionary balancing of many factors.” Davis v. Wal-Mart Stores Inc., 00-0445 (La.11/28/00), 774 So.2d 84; Gibson v. Bossier City Gen’l Hosp., 594 So.2d 1332 (La.App. 2 Cir.1991). Nevertheless, the discretion of the trial court is not unlimited. In the recent case of Martin v. Heritage Manor South, 00-1023 (La.4/3/01), 784 So.2d 627, the supreme court emphasized:
The fact that a determination on a motion for new trial involves judicial discretion, however, does not imply that the trial court can freely interfere with any verdict with which it disagrees. The discretionary power to grant a new trial must be exercised with considerable caution, for a successful litigant is entitled to the benefits of a favorable jury verdict. Fact finding is the province of the jury, and the trial court must not overstep its duty in overseeing the ad *1259 ministration of justice and unnecessarily usurp the jury’s responsibility. A motion for new trial solely on the basis of being contrary to the evidence is directed squarely at the accuracy of the jury’s factual determinations and must be viewed in that light. Thus, the jury’s verdict should not be set aside if it is supportable by any fair interpretation of the evidence. Id, at p. 4, 784 So.2d at 630-631 (emphasis in original; internal citations omitted).
In considering a motion for new trial under art.1972, “the trial court may evaluate the evidence without favoring either party; it may draw its own inferences and conclusions; and evaluate witness credibility to determine whether the jury had erred in giving too much credence to an unreliable witness.” Joseph v. Broussard Rice Mill, 00-0628 (La.10/30/00), 772 So.2d 94. However, this does not mean that the trial judge can usurp the jury’s fact-finding role. Martin v. Heritage Man- or South, supra. In fact, the trial court is admonished to “state specific reasons for its ruling, which would greatly simplify and assist the review process.” Id, at 7, 784 So.2d at 633.
The standard of appellate review of a ruling on a motion for new trial is whether the trial court abused its discretion. Id, and citations therein. Although the trial court has much discretion regarding applications for new trial, “in a case of manifest abuse the appellate court will not hesitate to set the trial court’s ruling aside, or grant a new trial when timely applied for.” La. C.C.P. art.1971, Official Revision Comment (d).
In essence, the ruling on a motion for new trial implicates, and requires the appellate court to balance, two very important concepts: the great deference given to the jury in its fact finding role and the great discretion given to the trial court in deciding whether to grant a new trial. Davis v. Wal-Mart Stores, supra. “The scales are clearly tilted in favor of the survival of the jury’s verdict, but the trial court is left with a breadth of discretion which varies with the facts and events of each case.” Martin v. Heritage Manor South, at 6-7, 784 So.2d at 632.
In light of these precepts, we have closely reviewed the record evidence to determine whether the jury’s verdict is supportable by any fair interpretation of the evidence. Davis v. Wal-Mart Stores, supra. If it is, then the grant of new trial is an abuse of the trial court’s discretion. Martin v. Heritage Manor South, supra.

Discussion: Is the Verdict Supportable?

In support of his theory that TAC was responsible for his injuries, Boylston called several expert witnesses. Captain Moon, an expert in fire investigation, established that fire requires a fuel source and ignition. He | fifound that in this case, the fuel was gasoline vapors. He declined to identify the ignition source, even though Boyl-ston told him he had started to light the cigar. Capt. Moon testified that a lighter or a lit match, a car engine running nearby, or static electricity were about equal possibilities.
Retired Chief Bo Roberts of the Shreveport Fire Department agreed that the fuel was gasoline vapors. In a pretrial deposition, he said the ignition source was inside Boylston’s car. However, after reading Tidwell’s deposition, he felt the ignition occurred outside the car, yet he still could not say one source was more likely than any other. He noted that if the tanker had parked farther from the car, at least 25 ft., the accident probably could not have occurred. Finally, Chief Roberts stated that the wind had little effect on the accident, as gasoline vapors are 4-5 times heavier than air. The parties stipulated *1260 that the wind that afternoon was 16-20 knots from the south or southwest, a rather brisk breeze blowing from Boylston’s car toward the tanker.
Boylston’s primary witness was Dr. Dieter Heinz, a chemical engineer from California with expertise in the field of cause and origin of fire, and safety in the loading, transportation and unloading of petroleum products. He declared that TAC’s training manual was totally inadequate for today’s high-performance gaso-lines, and cited DOT regulations prohibiting anyone from having a lighted cigarette within 25 ft. of a motor vehicle containing flammable liquids. He also testified that a tanker must be grounded to prevent static discharge. In short, he felt that Tidwell violated several safety regulations.
|7Pr. Heinz testified that the fuel source was gasoline vapors that poured out of the vapor release valve on the back of the tanker when Tidwell opened it, and the ignition source was static electricity created when Tidwell placed the plastic cap on the metal rear end of the tanker. He concluded that this ignited the vapor trail, causing flames to flow from the “lean” to the “rich” end of the vapors. He explained that the “rich” end of the trail was near Boylston’s car because the 16 knot wind was channeled by the terrain to strike the broad side of the trailer and “bounce” back toward the Grand Am. This propelled the heavy gasoline vapors toward the car. Dr. Heinz could not rule out an ignition source inside the car, but he felt the vapors there would not be dense enough to catch fire.
On cross examination, Dr. Heinz admitted that when he initially formulated this scenario, he assumed that Tidwell had actually opened the belly valves and that 500 ml (half a quart) of gasoline had spurted out. When shown that this did not occur, he testified that the vapors came from the vapor release valve. He admitted that emitting a low concentration of the vapors from the vapor release valve was “unfortunately permissible.” He also admitted that according to the records he reviewed, the tanker itself had no defects.
Finally, Boylston presented a computer animation assembled by Marion Marks, an expert in computer animation. Based on Dr. Heinz’s opinions and the topographical data, this animation showed how gasoline vapors, depicted as particles or blobs, could blow backwards against the |swind and flow to Boylston’s car.[2] He admitted using strictly Dr. Heinz’s data, and was unaware that the wind was at least 16 knots at the time (over 18& miles per hour).
TAC’s expert witness was Dr. Andrew Armstrong of Arlington, Texas, a chemist with particular application to fires and causes of fire. He discounted Dr. Heinz’s theory that static electricity emanated from the tanker because, under the circumstances, the rubber tires provided adequate grounding. He also disagreed with Dr. Heinz’s theory that gasoline vapors gushed out when Tidwell opened the vapor release valve; according to the bill of lading, the tank was not overfilled, and Tid-well did not describe any surge of pressure. Dr. Armstrong testified that Dr. Heinz’s scenario was impossible because if flammable vapors had poured from the vapor release valve, and a spark had been generated by setting the plastic cap on the metal bumper, the vapors would have exploded then and there-which obviously did not occur. He instead hypothesized that the gas vapors must have come from a gas *1261 spill on the pavement south of Boylston’s car.
Dr. Armstrong agreed that the “eddy” effect can cause a small amount of fluid to flow against the current, behind a large obstacle. However, he found nothing in the layout of the PennzMart that could have blown gasoline vapors against a strong wind and back to the Grand Am. He referred to a videotape made at the Pennz-Mart with a south wind, a gas tanker and a car situated as they were on the date of the accident. Streamers tied to sticks at various heights all blew to the north; nowhere did they blow | flsouth, or against the wind.[3]
Dr. Armstrong theorized that the ignition came from a match or static electricity inside Boylston’s car; the fuel vapors came from a gasoline spill near the car. He explained that when the vapor ignited, it sent out a “shock wave” and a fire front, sucking in the air behind it; as the air returned, the flame flowed back to the car, and that is the part of the event that Tidwell saw only after he heard somebody shout.
Called as a rebuttal witness, Dr. Heinz admitted that Dr. Armstrong’s videotape of the wind characteristics at the Pennz-Mart was “awesome,” but said that it did not change his opinion. Notably, Dr. Heinz did not attempt to refute Dr. Armstrong’s “shock wave” theory or dispute his conclusion that Tidwell only saw the second half of the event.
In granting the motion for new trial, the district court found that the “manifest weight of the evidence” was that the vapors came from the tanker truck. We agree that a greater number of witnesses held this theory, and that the alternative sources of gasoline vapors, such as a spill near Boylston’s car or a fuel leak in it, are conjectural. However, these facts do not resolve the dilemma posed by Dr. Armstrong: if the fuel source was a stream of vapors gushing from the vapor release valve, then the vapors should have ignited then and there when Tidwell placed the cap on the bumper and created the spark. Obviously, this did not happen. The fact that the explosion did not occur immediately and at the rear of the tanker lends manifest weight to Dr. Armstrong’s theory.
LnDespite the supreme court’s admonition to “state specific reasons for its ruling,” Martin v. Heritage Manor South, supra, the trial court did not mention the ignition source. This failure, under the facts presented, is even more unsettling. Boylston’s theory depended on a finding that Tidwell generated a spark at the rear of the tanker; but as noted, Dr. Armstrong exposed a serious flaw in this hypothesis. The other theory is that ignition occurred inside the car, as Chief Roberts stated in deposition. At trial, Boylston was insistent that he did not light the cigar, as he had quit smoking sometime earlier. However, he told Tidwell twice at the scene that he tried to light the cigar; he made a similar admission to Capt. Moon, who also noted witness statements to that effect. Capt. Moon’s photos showed an unwrapped cigar on the console of the Grand Am, belying the claim that Boylston did not intend to smoke it himself. Given his inconsistent statements and his evasiveness on cross examination, the jury was entitled to discount much of Boylston’s testimony. In fact, at the hearing on the motion for JNOV or new trial, Boylston’s counsel conceded that the jury “was well within its right * * * to find that Mr. Boylston ignited a cigar.” R.p. 1424. Regardless of the source of the *1262 gasoline vapors, this evidence supports the jury’s implicit conclusion that the ignition source occurred inside the Grand Am.
As in Martin v. Heritage Manor South, supra, the instant verdict was informed by the scientific theories of highly qualified experts, both of whom presented understandable scenarios of how the accident occurred. If the defense theory is a “fair interpretation of the evidence,” the verdict must beJjjupheld. There was virtually no physical evidence, the lay testimony was conflicting, and the plaintiff had diminished credibility. The defense theory reasonably accounts for all these facts. By contrast, the plaintiffs expert utilized faulty initial assumptions, did not refute or discredit the defense’s theory, and most importantly, did not explain the apparent flaw exposed in his own theory. On this record we are constrained to hold that the defense theory is a fair interpretation of the evidence, and that the verdict accepting it is supportable by the evidence. The trial court therefore abused its discretion in granting the new trial. Martin v. Heritage Manor South, supra.
The Spoliation Charge
In defense of the new trial, Boyl-ston urges in brief that a prejudicial jury charge regarding spoliation denied him substantial justice and went against the manifest weight of the evidence. A new trial may be granted when the verdict, although free of legal error, does not do substantial justice or is against the manifest weight and probative effect of the evidence. Poland v. Poland, 34,085 (La.App. 2 Cir. 12/6/00), 779 So.2d 852, and citations therein. The trial court delivered instructions that included this charge:
If you can find a party has destroyed, altered, concealed, or failed to produce evidence within its control, you are allowed to presume that, had the evidence in question been presented, it would be unfavorable to that party.
At the hearing on the motion for JNOV or new trial, the trial judge remarked that when he inserted this charge, he thought the defendants had made a formal discovery request to inspect the Grand Am, but in fact there was no such request. The judge stated, “I have some concern about having | ^included the spoliation charge under those circumstances.” Boylston now argues the jury may have relied on this charge in reaching an “unjust decision” and that the resulting prejudice allowed the trial court to grant the motion for new trial.
We have closely reviewed the record and find no evidence that Boylston objected to this charge.[4] In the recent case of Davis v. Witt, 02-3102 (La.7/2/03), 851 So.2d 1119, the supreme court analyzed the effect of an improper jury charge on a motion for new trial:
Turning now to the case before us, we find the trial judge’s reliance on improper jury instructions, the first articulation in support of his conditional grant of a new trial, was erroneous as a matter of law. It is well accepted a party may not assign as error the giving or the failure to give a jury instruction unless he objected to it at trial. La. C.C.P. art. 1793 C. As such, we have said that the failure to object to the inclusion of jury charge precludes a party from raising a claim that the trial judge erred by failing to properly charge the jury. Trans-Global Alloy Ltd. v. First Nat. Bank of Jefferson Parish, 583 So.2d 443, 448 (La.1991).
*1263 In the present case, the record shows the trial judge gave four particularized instructions on the duty of law enforcement officers: (1) they have exclusive power to regulate traffic; (2) they are duty-bound to exercise this power reasonably to protect life and limb and to refrain from causing injury or harm; (3) the scope of their duty is to choose a course of action that is reasonable under the circumstances; and (4) the moment a law enforcement officer becomes aware of a dangerous traffic situation, he/she has an affirmative duty to see that motorists are not subjected to an unreasonable risk of harm. At no time did the Davis children object to the inclusion of any of these jury charges or, as a matter of fact, to any others actually given. Accordingly, we find the trial judge erroneously relied upon improper jury instructions as a ground to conditionally grant a new trial. Id., at 19-20 (footnotes omitted).
113Simply put, Boylston did not object to the spoliation charge. Like the plaintiffs in Davis, he cannot now raise the charge as a justification for a new trial. Moreover, the trial court erred as a matter of law if it granted a new trial on this basis. Boylston’s reliance upon the charge to support the granting of a new trial clearly lacks merit.

Conclusion

For the reasons expressed, we find that it was an abuse of discretion for the trial court to grant a new trial as the jury’s finding, that the negligence of TAC was not a cause in fact of Boylston’s injuries, was supportable by a fair interpretation of the evidence. We therefore grant the writ, make it peremptory, and direct the entry of a judgment in accordance with the verdict. All costs are assessed to the plaintiff, Varnell Boylston.
WRIT GRANTED AND MADE PEREMPTORY.

. Photographs in evidence also show that the lids to the underground tanks are located between the northmost fuel island and the north fence.

. Mr. Marks played the 60-second animation on a video screen for the jury, but no copy of it on videotape, CD or otherwise was entered into evidence.

. The videotape was admitted as Exhibit Tid-well — 10.

. The record also shows that the spoliation charge was not part of TAC’s proposed jury charges, R.p. 520. Nevertheless, the court stated that the parties had discussed it at a charge conference.