DANIEL L. DYSART, Judge.
11Daniel Ambrose, Jr., appeals a judgment wherein the trial court adopted the verdict of a jury. The jury found in favor of the defendants, Walt Disney World Company, Amateur Athletic Union of the United States, Inc., and Lexington Insurance Company, dismissing Mr. Ambrose’s lawsuit, with prejudice. For the following reasons, we affirm.
BACKGROUND:
Mr. Ambrose claimed to have been injured on July 25, 2005, while working for GES Exposition Services, Inc. (“GES”), at the Morial Convention Center unloading trailers originally loaded by Walt Disney World Company (“Disney”) with in-line hockey rinks to be used at an event hosted by the Amateur Athletic Union (“AAU”).
The only issue to be decided on appeal is whether the jury was correct in finding that Mr. Ambrose’s injury was not caused by unloading a trailer originally loaded by Disney.
J^DISCUSSION:
In his first assignment of error, Mr. Ambrose argues that the jury verdict was clearly contrary to the law and evidence. He argues that he proved by a preponderance of the evidence that he was injured while unloading a trailer originally loaded by Disney. The trailer was improperly loaded causing him to suffer severe injuries to his shoulder and neck when something on the truck fell on him.
As this is a purely factual issue, we are bound to review the jury’s finding using the manifest error/clearly wrong standard. This Court employs a two-part test on review: 1) We must find from the record that there exists no reasonable factual basis for the finding by the trier-of-fact; and, 2) we must further determine that the record establishes that the finding is clearly wrong. Stobart v. State, Dep’t of Tramp. & Development, 617 So.2d 880, 882 (La.1993), citing Mart v. Hill, 505 So.2d 1120, 1127 (La.1987). Although this Court might find that its own evaluations are more reasonable than the fact-finder’s, “reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony.” Id.
Our review of the transcript reveals that testimony given by the witnesses at trial varied greatly as to the circumstances surrounding Mr. Ambrose’s injuries. Rather *182 than rely on the out-of-context excerpts quoted in Mr. Ambrose’s brief, we | ahave reviewed the testimony in its entirety and find a reasonable factual basis exists for the jury’s verdict.
It is undisputed that the subject hockey rinks were stored in 53 foot trailers in Orlando, Florida. It is also undisputed that the rinks were transferred into six 28 foot, or PUP trailers, to be transported to New Orleans for the event. What is disputed is whether Mr. Ambrose was injured while unloading one of those six trailers.
In more than one deposition given by Mr. Ambrose prior to trial, he gave conflicting testimony to that given at trial. At trial, he testified that he arrived at work at 8 a.m., but that the Disney trucks were late arriving at the dock. The first truck was unloaded by a forklift, but the second truck was poorly loaded, necessitating it being unloaded by hand. He notified Steve Sabito, his supervisor, who took pictures of the contents to document possible damage. He unloaded the fust row of cargo, and was holding up about shoulder height “something,” possibly Plexiglas, to allow a co-worker to pull cargo from underneath. He saw something in his peripheral vision falling, and was struck by a 4x4 wooden crate. On cross-examination, he said he couldn’t remember if it was a 4x4 crate or a 4x4 piece of wood. At trial, Mr. Ambrose testified that the truck he was unloading was a PUP trailer, although he was adamant in prior depositions that it was a 53 foot trailer. In depositions, he stated the doors were swing doors and had to be opened before the truck backed the trailer up to the dock. At trial, he said the doors were the roll-up type, usually found on PUP trailers.
Both Keith Noll, a volunteer working for AAU coordinating the event, and Sergio Gutierrez, a worker for the company hired by Disney to set up the displays, testified that the PUP trailers arrived at the dock before 8:30 a.m. Both men testified that the cargo in one of the PUP trailers had shifted during transport. The cargo in that trailer was the dasher boards, the perimeter of the rink into which the Plexiglas is attached. Mr. Noll explained at trial that the Disney dasher boards were on special carts that Disney had constructed to store them. The racks could be picked up by forklift. The dasher boards for the AAU rink were stacked in the trailer. However, the Plexiglas and sport floor were transported in separate trailers.
Both men testified that it took approximately two hours to unload all six of the PUP trailers, with the work being completed no later than 11:30 a.m. Mr. Gutierrez specifically recalled that all six trailers were unloaded by forklift, not by hand. Mr. Noll and Mr. Gutierrez both denied that anyone was hurt while unloading a PUP trailer.
Mr. Ambrose disputed the report from the nurse’s station where he claims to have gone immediately after his accident. The report indicated that he arrived at 1:27 p.m. He also disputed the intake form from Lindy Boggs Medical Center that indicated he arrived at 3:26 p.m. The medical record also reported that Mr. Am-brose left the emergency room, but returned at 8:05 p.m., when he was seen by a doctor and was x-rayed. He testified that he never left the hospital, but speculated that he may have “stepped out” when his name was called. As his injury was not a true emergency, he was not called again until much later.
| üSteve Sabito, Mr. Ambrose’s supervisor, testified that Mr. Ambrose called him at 12:45 p.m. to tell him he had been injured when a 4x4 platform fell on him. *183 He had no recollection of telling Mr. Am-brose to unload a poorly loaded truck.
The only witness who attempted to corroborate Mr. Ambrose’s trial testimony was Albert Brown, a forklift operator also employed by GES. He testified at trial that some of the trucks that day had to be off-loaded by hand, palletized and then picked up by forklift. He testified that on the day of the accident, they started working at 8 a.m. It usually takes about 25 to 30 minutes to unload a PUP trailer, but would take 2 ½ to 3 hours to unload one by hand. He initially thought they would be unloading 53 foot trailers, because PUP’s did not pull up to the dock. When asked why he testified in a previous deposition that they were unloading 53 foot trailers with swing doors on the day of the accident, he said he assumed it was 53 foot trailers because they were already backed up to the dock with the doors open. On cross-examination, he admitted that “after talking to people,” he would testify differently than he had in his 2009 deposition.
Mr. Brown also testified that the equipment in the trailer in which Mr. Ambrose was injured was loaded with hockey equipment to be used at the AAU event. However, Mr. Noll, the AAU coordinator for the event, testified that there were many exhibitors at this event, one of which had a hockey shop complete with skates and sticks, and was equipped to fix hockey equipment. There was also a mini-type rink where children could take “shots” and win prizes. He verified that | fisome exhibitors used Plexiglas in their exhibits. All of these exhibitors had their cargo delivered in 53 foot trailers.
Mr. Ambrose argues that he carried his burden of proving that it was more likely than not that the trailer in which he was injured was one loaded by Disney in Orlando and contained Disney’s rink equipment. He refers to the testimony of both Mr. Noll and Mr. Gutierrez to assert that the trailers were late arriving at the dock in an effort to explain why he was not hurt until 12:45 p.m. A thorough reading of the testimony does not substantiate this assertion.
Mr. Gutierrez testified that upon arriving at the dock at 7:30 a.m., he could not immediately locate the trailers because he was looking for 53 foot trailers. He was unaware that the equipment had been transferred to PUP trailers in Orlando. He was also under the impression that the trailers had arrived the night before. However, he testified that he returned to the dock at 8:30 a.m. and the unloading began shortly thereafter.
Mr. Noll testified that he was the first one on the dock at about 7:30 a.m. When he did not see the trailers, he called the transporter. Before he hung up, he saw the trailers being pulled in. Contrary to Mr. Ambrose’s assertions, Mr. Noll did not testify that the trailers arrived two hours late in the morning before lunch. Rather, he stated that the unloading was finished before lunch.
A review of the record reveals that Mr. Ambrose could not identify the trailer in which he was injured, the type of cargo contained in the trailer, the object that fell and injured him, or the time that the injury occurred. At best, he was able |7to establish that he was at work on July 25, 2005, and was injured while unloading cargo to be used at an AAU event.
Based on the above and our own reading of the entire transcript, it is clear that the jury was well within its discretion to conclude, applying a preponderance of the evidence standard, that Mr. Ambrose was not injured in a Disney trailer. We cannot say that the jury’s finding was manifestly erroneous or clearly wrong.
*184 In his second assignment of error, Mr. Ambrose argues that the jury interrogatories were confusing and misleading to the jury. In brief, counsel states that he made “numerous objections to the Jury Interrogatories.”
Article 1793 of the Louisiana Code of Civil Procedure provides in part:
C. A party may not assign as error the giving or the failure to give an instruction unless he objects thereto either before the jury retires to consider its verdict or immediately after the jury retires, stating specifically the matter to which he objects and the grounds of his objection. If he objects prior to the time the jury retires, he shall be given an opportunity to make the objection out of the hearing of the jury.
The record reveals that all parties agreed to the proposed jury interrogatories several days in advance of trial. On the second to last day of trial, counsel for Mr. Ambrose raised a concern about the interrogatories during a conference in chambers with all counsel present. The trial judge voiced her concerns about raising this concern so close to the end of the trial and well past the deadline for submission of the interrogatories. No formal objection was lodged by plaintiffs counsel and the discussion ended.
|sOn the last day of trial prior to the jury being seated, plaintiffs counsel again raised a concern about jury interrogatory No. I.[1] The following colloquy ensued:
The Court: What’s wrong with these interrogatories? What happened that we now want to change it? Originally, this was a consent by you all. You submitted it to me. Now something happened and you all want to change these interrogatories?
Mr. Hardy: My fault, Judge. Blame it on me. I’ll just note my objection for the record and we can move on.
The Court: Well, I’m going to note it. I mean, unless you all have a problem. Do you want this? If you all can—
Mr. Schafer: (Discussion about subsequent interrogatory dealing with damages.)
Mr. Eckert: Your Honor, I’m confused as to what we’re even changing. I thought we agreed to these original jury interrogatories. I’ve not seen anything since, and to start off saying who’s involved, you, number one, have to ask was he involved in the accident. Number 2, you have to, I think under the law, like Mr. Mann had said, do you find the condition of this trailer presented unreasonable risk of harm. Then you find out the sustained injuries, and then you break down the fault, if there’s any, on the defendant. But what I’m hearing is the first question is — I don’t know what it is now, or what they’re asking.
The Court: It’s all about fault.
Mr. Eckert: So it’s at fault. I’ve never seen that done before.
The Court: Well, I certainly haven’t practiced as long as all of you have. I’ve never done that. I’ve done quite a few jury trials.
|flMr. Mann: Final comment, Your Hon- or. We’re talking about specific interrogatories. This form that has been submitted is specific, the facts of this case. Therefore, I think it will be clear to the jury. The jury can understand this as it pertains to this ease. I don’t *185 think it presents any issues for their consideration.
The Court: Okay, Mr. Hardy, so you want to put why you think that we need to go—
Mr. Hardy: Let’s just move on, Judge. I would just submit that when I read the law, I was looking under directed verdict because I’m sure we’re going to get a motion — I’m going to make one, too — I came across this. I’ll just note for the record that I think the standard generic is what the law propounds. But I’m just going to note the objection for the record and we’ll move on, okay.
The Court: Okay. That objection is noted.
This Court in In Re Asbestos v. Bordelon, Inc., 96-0525, p. 12 (La.App. 4 Cir. 10/21/98), 726 So.2d 926, 940, stated:
In order to preserve an objection to a jury charge for appeal, a party must specifically object at trial and must state reasons for the objection, and a general objection is insufficient. Rule preventing party from assigning jury instruction as error absent a specific objection at trial also applies to jury interrogatories. (Emphasis added) (Internal citations omitted).
Clearly the objections made by plaintiffs counsel are not in conformity with what is required by In Re Asbestos. Aside from the general objection, it is not clear what counsel is objecting to in reference to the jury interrogatory. On appeal, he argues that the interrogatory was confusing and misleading to the jury. He cannot raise this argument for the first time on appeal.
Based on the above, we find Mr. Ambrose did not properly preserve this issue for appeal. However, assuming ar-guendo, that a proper objection was raised to this interrogatory, we find no merit to the argument that the interrogatory was | ^confusing or misleading. To the contrary, the interrogatory is clear, concise and necessary as a primary issue to be decided by the jury was whether Mr. Am-brose was working in a trailer loaded by Disney.
Mr. Ambrose’s third assignment of error is that the trial court erred in not granting his Motion for New Trial as the jury verdict was clearly contrary to the law and evidence.
Louisiana Code of Civil Procedure article 1972 provides that a new trial shall be granted “[wjhen the verdict or judgment appears clearly contrary to the law and the evidence.” The Louisiana Supreme Court recently stated, however, that the jurisprudence interpreting article 1972 recognizes the trial court’s discretion in determining whether the evidence is contrary to the law and evidence. Martin v. Heritage Manor South, 00-1028, p. 8 (La.4/3/01), 784 So.2d 627, 630. That discretion is limited, however, as the trial court cannot freely interfere with any verdict with which it disagrees. Davis v. Wal-Mart Stores, Inc., 00-0445, p. 10 (La.11/28/00), 774 So.2d 84, 93.
The Martin court further explained:
[i]n reviewing a ruling on a motion for new trial, ‘we are faced with the balancing of two very important concepts: the great deference given to the jury in its fact finding role and the great discretion given to the trial court in deciding whether to grant a new trial. The scales are clearly tilted in favor of the survival of the jury’s verdict, but the trial court is left with a breadth of discretion which varies with the facts and events of each case.’
Martin, 00-1023, pp. 6-7, 784 So.2d at 632. (internal citations omitted.)
*186 With the aforementioned principles in mind, and based upon our thorough review of the record evidence as stated in our review of assignment of error No. 1, |nit cannot be said the trial court abused its discretion denying the motion for new trial.
Mr. Ambrose’s fourth assignment of error raises as error the trial court’s denial of his Motion for Judgment Notwithstanding the Verdict.
In Bigelow v. Crescent Title, LLC, 08-0932, p. 6 (La.App. 4 Cir. 10/15/08), 997 So.2d 83, 87, this Court explained that the standard of review for a JNOV is a two part inquiry. First, using the same criteria the trial court uses in deciding whether to grant JNOV, the appellate court must determine if the trial court erred. Davis v. Wal-Mart Stores, Inc., 00-0445 p. 5 (La.11/28/00), 774 So.2d 84, 89. “[T]he standard for granting or denying a JNOV is the same as that for a directed verdict— whether reasonable minds could differ.” Frank L. Maraist and Harry T. Lemmon, 1 Louisiana Civil Law Treatise, Civil Procedure § 13.4 (1999); see La. C.C.P. art. 1811. “After determining that the trial court correctly applied its standard of review as to the jury verdict, the appellate court reviews the JNOV using the manifest error standard of review.” Bigelow, 08-0932, p. 6, 997 So.2d at 87, citing Davis, supra.
As stated above, we find no manifest error in the jury’s findings. Accordingly, we find no error in the trial court’s denial of Mr. Ambrose’s Motion for JNOV.
Mr. Ambrose’s last assignment of error is not truly an assignment of error. Rather, he re-urges that this Court should reverse the judgment and award damages to him. For the reasons set for above, we decline to do so.
| ^Accordingly, we affirm the judgment of the trial court dismissing Mr. Ambrose’s lawsuit, with prejudice.
AFFIRMED

. The jury interrogatory read as follows: "Do you find that Ambrose was involved in an accident on July 25, 2005 while unloading a trailer that had been loaded by Walt Disney World Company in Orlando, Florida." The jury responded "No,” and deliberated no further.