|,MIRIAM G. WALTZER, Judge.
STATEMENT OF THE CASE
On 22 October 1999, William J. Woess-ner, M.D. filed suit against Park One, Inc. for damages caused by Park One’s breach of a contract of sublease between the parties. On 17 November 1999, Park One answered with a general denial and pled as an affirmative defense that the sub-lease was not executed, and its duration was not fixed, rendering it a month-to-month agreement that was timely cancelled by Park One. Park One also pled affirmatively that Dr. Woessner was estopped from making his claim and that his claim had been extinguished by payment.
On 31 July 2001, Dr. Woessner amended and supplemented his petition, correcting the defendant’s name to Park One of Louisiana, Inc. and adding to his original claim for breach of contract a second count alleging detrimental reliance on representations made by Park One’s President and Chief *331 Executive Officer, Edward R. Urrutia. Park One’s answer generally denied Dr. Woessner’s allegations.
| ?The matter was tried on 6 December 2000 and taken under advisement. On 21 December 2000, the trial court entered judgment in favor of Dr. Woessner in the amount of $33,308 plus interest from judicial demand and costs, and denied Park One’s Motion for New Trial. On 29 May 2001, the trial court amended its judgment to correct a computation error, and awarded Dr. Woessner $36,058 plus interest and costs. Park One appeals from that judgment, and we affirm.
STATEMENT OF FACTS
Dr. Woessner, a self-employed physician in family practice, testified that he owns his office at 750 Camp Street in New Orleans. In 1997, when renovating the three-story office building, he engaged in a search for employee parking in the immediate area. He found an overgrown empty lot owned by Dixie Mill, and eventually negotiated a lease for a three-year term at a monthly rental of $800 for the lot. Dr. Woessner testified that he made all monthly rent payments to Dixie Mill and continues to pay the company rent at the agreed rate.
Jim Huger, a principal of Dixie Parking and an acquaintance of Dr. Woessner, met with Dr. Woessner, Urrutia and Urrutia’s assistant, John Tusia, at the overgrown empty lot, which was adjacent to a parking lot owned by Park One and located at 843 45 Magazine Street. Huger and Urrutia calculated the number of spaces to be gained by Park One if the fence separating the Park One lot from the empty lot were removed. Dr. Woessner would lease the empty lot from its owner, Dixie Mill, and nineteen parking places would be created by the new 13subdivision of the property. Since Dr. Woessner needed only ten parking spaces, he and Urrutia agreed that the doctor would have control of ten spaces and would. receive $1,000 monthly base rent plus $60 per month for each of the nine spaces designated to Park One and the same amount monthly for any of the ten spaces designated to Dr. Woessner that he did not use. Dr. Woessner testified that he and Urrutia, in Huger’s presence, agreed to the rental amounts and to a term of three years from the date when the empty lot could begin to be used for parking. The parties agreed that the lease could be terminated prior to the expiration of three years only if Dixie Mill sold the property, and that at termination, Park One would replace the fence that separated the Park One and Dixie Mill lots. Urrutia and Dr. Woessner shook hands, and the doctor testified he believed the deal was consummated and agreed to at that time.
The meeting was memorialized by a letter, stipulated to by the parties, setting out the agreement. The letter, dated 6 January 1998, was sent by facsimile from Park One to Dr. Woessner. The letter was written on Park One stationery and was signed by Urrutia, who was designated in the letter as Park One’s President and CEO. Urrutia wrote, in relevant part:
Park One would sub-lease your lot and consolidate it with ours under the following terms we discussed:
1. Your practice will get up to 19 free spaces. Any spaces you do not want or need, Park One would lease back from you at $60 per month. Initially, you would take ten free spaces and Park One would lease back nine at $60 = $540 per month.
|42. We would pay a base rental of $1,000 per month. Any spaces leased back per paragraph 1 above would be paid as additional rent.
*332 [[Image here]]
5. We would have term of three years with a two year option, cancela-ble if the property sells. [Emphasis added.]
Dr. Woessner testified that Urrutia had never mentioned a thirty-day cancellation provision. Such a provision would have been totally unacceptable to Woessner, who did not want to manage a parking lot and who intended that the term of the sublease would be co-extensive with the term of Dr. Woessner’s lease with Dixie Mill, for a three year term.
Park One hired and paid a contractor to tear down the fence and clear and prepare the lot. The parking operation began in January, 1998. In March, 1998, Dr. Woessner received from Urrutia a sublease agreement containing the following provision:
Notwithstanding anything to the contrary contained herein, either party to this sub-lease agreement shall have the right to cancel this sub-lease agreement by giving the other party thirty (30) days prior written notice, provided, however, that Sub Lessor may cancel this sub-lease agreement only in the event that the leased premises is sold, joint ventured, or otherwise developed.
This language clearly contradicts Park One’s letter agreement. Dr. Woessner testified that he never agreed to this language and, upon receipt of the agreement, called Urrutia and told him he would not sign the lease with that language. Dr. Woessner testified repeatedly and unequivocally that he would not have entered into the sub-lease with Park One if it was subject to 30 day termination.
IfiDr. Woessner testified that Park One continued to use the lot and paid rent under the original oral agreement monthly through either November or December, 1998, for a total of $11,470. In December, Park One unilaterally informed Dr. Woess-ner that it would pay only the base rent of $1000, and paid no rent at all after December, 1998.
The parties stipulated to a handwritten note from Urrutia to Dr. Woessner, signed by Urrutia and initialed by Dr. Woessner noting that Park One would erect the fence upon termination of the sub-lease, and acknowledging that $540 in rent for the prior month remained due and unpaid.
Dr. Woessner testified that Mr. Wayne Ducote, owner of Park One, called him and advised Dr. Woessner that Park One was losing money on the lot and wanted to terminate the sub-lease. Dr. Woessner asked to get together with Ducote to discuss the matter, but was subsequently unable to get Ducote to return his phone calls or to agree to a meeting.
On 1 October 1998, Ron Marlow, designated as General Manager of Park One faxed a letter to Dr. Woessner purporting to cancel the sub-lease and recognizing Park One’s undertaking to re-erect the fence. In fact, Park One did not replace the fence. Dr. Woessner testified that he obtained an estimate of $1750 to replace the fence. Dr. Woessner also testified that he received $10,950 in rental payments from persons who rented his parking spaces.
Mr. Huger testified that he was an adviser to Dr. Woessner, and confirmed Dr. Woessner’s testimony concerning his involvement in the confection of the sub-__|ease6 between Dr. Woessner and Park One. Dr. Woessner paid Huger $200 each month from Park One’s rental payment for his efforts. Huger confirmed that Urru-tia/Park One at no time mentioned a 30 day termination right. Huger saw and heard Urrutia and Dr. Woessner discuss the terms of the sub-lease and express consent to those terms.
*333 Urrutia testified that it was his understanding that Park One would pay Dr. Woessner the base rental of $1,000 per month plus $60 for any additional space that Park One was able to sell. Urrutia claimed that he anticipated Dr. Woessner would send his patients to the lot to use some of the additional spaces. However, on cross-examination, he admitted that there was never any agreement by which Dr. Woessner would assist in marketing the spaces. He admitted on direct examination that the only specific discussion of the term of the lease was the understanding that the sub-lease would be cancelled in the event that Dixie Mill sold Dr. Woessner’s portion of the property. After the on-site discussion in early January, 1998, Urrutia told Dr. Woessner he would send him a written sub-lease for the property, but denied that he had made clear to him that no lease existed unless it was formalized in writing. Urrutia denied that he addressed the 30 day termination issue with Huger or Dr. Woessner prior to having sent the form sub-lease to Dr. Woess-ner.
The trial court accepted Dr. Woessner’s testimony and, having considered it together with Urrutia’s testimony, concluded that a binding three-year lease arrangement existed between Dr. Woessner and Park One. The trial .judge ^accepted Dr. Woessner’s testimony that Park One breached the agreement when it ceased paying its monthly rent obligation. Although Dr. Woessner claimed $45,720 in damages, the trial court found that the evidence proved that Dr. Woessner received $10,950 in increased rent payments compensating for the unused parking spaces. The judge found that the parties agreed that Park One would replace the fence removed in January, 1998, for the lowest estimate, $1,288.
STANDARD OF REVIEW
It is well settled that a court of appeal may not set aside a trial court’s or a jury’s finding of fact in the absence of “manifest error” or unless it is “clearly wrong,” and where there is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed on review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Where there are two permissible views of the evidence, the factfinders choice between them cannot be manifestly erroneous or clearly wrong. When findings are based on determinations regarding the credibility of witnesses, the manifest error: clearly wrong standard demands great deference to the trier of fact’s findings. Where a factfinder’s finding is based on its decision to credit the testimony of one or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong. Rosell v. ESCO, 549 So.2d 840, 844-845 (La.1989).
FIRST ASSIGNMENT OF ERROR: The trial court committed manifest error in denying appellant’s motion for new trial.
| sPark One contends that its post-trial discovery of its own cancelled check containing allegedly probative evidence warrants a new trial pursuant to LSA-C.C.P. art.l972(2), which provides in pertinent part:
A new trial shall be granted, upon contradictory motion of any party, in the following cases:
* * *
(2) When the party has discovered, since the trial, evidence important to the cause, which he could not, with due diligence, have obtained before or during the trial.
*334 [[Image here]]
This article requires a party seeking its benefit to demonstrate that it has done all that is reasonable to lead to timely discovery of the evidence. Barker v. Rust Engineering Co., 428 So.2d 391 (La.1983). Where it is doubtful whether the newly discovered evidence could have been discovered with proper diligence, this doubt is resolved against granting a new trial. Pahnvitz v. Fassman, 2 La.Ann. 625, 1847 WL 3433 (La.1847).
Park One’s argument that its post-trial discovery of its own cancelled check entitles it to a new trial is squarely controlled by LSA-C.C.P. art.l972(2) and our holding in Chrysler Credit Corp. v. Walker, 488 So.2d 209, 213 (La.App. 4 Cir.1986). Chrysler Credit argued its inability to produce accounting records showing installment payments due by defendant. This Court held:
Plaintiffs institutional unconcern for the correctness of its accounts ... does not make its own accounting records evidence that it could not, with due diligence, have obtained before or during the trial.
We find no abuse of the trial court’s discretion in denying Park One’s motion. The cancelled check was always in Park One’s custody. Park One has l9made no showing that the check was not available to it or to its counsel had Park One’s own records been examined with the degree of diligence required by the procedure article.
This assignment of error is without merit.
SECOND ASSIGNMENT OF ERROR: The trial court committed manifest error in ruling a binding three-year lease agreement existed between the parties.
Park One apparently recognizes that the law does not require that the sublease agreement between it and Dr. Woessner be reduced to writing. In support of this assignment of error, Park One relies on LSA-C.C. art.1947 which provides in pertinent part:
When, in the absence of a legal requirement, the parties have contemplated a certain form, it is presumed that they do not intend to be bound until the contract is executed in that form.
The trial court clearly did not find there was credible evidence of the essential condition to operation of this code article: that the parties contemplated that the sublease would be reduced to writing. Indeed, not only was there credible testimony from Dr. Woessner and from Park One’s CEO that such was not the case, but the actions of the parties, Park One’s payment of the agreed to rental fees for a year and Dr. Woessner’s acceptance of them, indicates that the parties did not intend to reduce their agreement to writing.
This assignment of error is without merit.
|inTHIRD ASSIGNMENT OF ERROR: The trial court committed manifest error in failing to reduce appellee’s award for failure to mitigate damages.
Dr. Woessner testified clearly and unequivocally that he had no intention of operating a parking lot, and that absent the sub-lease agreement with Park One, he would not have leased and improved the empty lot from Dixie Mill.
The trial court correctly reduced the award by Dr. Woessner’s mitigation of damages in the amount of $10,950, over 25 percent of the total amount of damages sustained. We find nothing in the record to support Park One’s contention that Dr. Woessner’s mitigation of a quarter of the damages was somehow “unreasonable.” The Park One claim is particularly untena *335 ble when viewed against its CEO’s testimony concerning the lack of demand for parking in the area of this lot and the availability of free parking under the Crescent City Connection.
This assignment of error is without merit.
FOURTH ASSIGNMENT OF ERROR: The trial court committed manifest error in calculating appellee’s damages.
Park One would limit its liability to the $1000 monthly base rent, contending that at the expiration of some underdeter-mined “initial period” Park One’s obligation to pay $60 for each of Dr. | nWoessner’s nine spaces that the doctor did not need. This claim is without basis in the record. There was a clear undertaking by Park One to pay $60 per month for the term of the sub-lease for as many of Dr. Woessner’s nine spaces that he did not use. The Urrutia letter clearly states that Dr. Woessner had the option to decide how many spaces he would release to Park One for $60 per month. There simply is no testimony in the record to support Park One’s contention that the additional rent obligation had a term different from that of the base rent obligation.
This assignment of error is without merit.
CONCLUSION AND DECREE
For the foregoing reasons, the judgment of the trial court is affirmed. Costs of this appeal are assessed against the appellant, Park One of Louisiana, Inc.
AFFIRMED.