904 So.2d 3 (2005)
Antoine McGHEE
v.
WALLACE DRENNAN, INC.
No. 2004-CA-0950.
Court of Appeal of Louisiana, Fourth Circuit.
April 20, 2005.
*5 Scott P. Shea, New Orleans, LA, for Plaintiff/Appellant.
Denis Paul Juge Juge, Napolitano, Guilbeau, Ruli, Frieman & Whiteley, Metairie, LA, for Defendant/Appellee.
(Court Composed of Judge MICHAEL E. KIRBY, Judge MAX N. TOBIAS, JR., and Judge LEON A. CANNIZZARO, JR.).
MAX N. TOBIAS, JR., Judge.
The plaintiff, Antoine McGhee ("McGhee"), appeals a judgment from the Office of Workers' Compensation, which found that McGhee did not prove that he suffered a personal injury by accident arising out of and/or in the course and scope of his employment. In addition, McGhee appeals from a judgment that denied his motion for new trial. After a review of the record, we affirm the judgments.
McGhee began working for the defendant, Wallace Drennan, Inc. ("Drennan"), in May 2001. Drennan is a construction company that performs street construction work, some of which entails the removal and replacement of sewer lines. In August 2002, Drennan began a major street project on Touro Street in New Orleans; part of the project involved replacing the sewer line beneath the street. McGhee and other Drennan employees testified that they sometimes came into contact with raw sewage; the only protection given to the employees was a paper suit and mask, and rubber gloves.
Drennan time records reveal that McGhee was present on the Touro Street project on 1, 2, 21, and 23 August 2002. McGhee contends that on these dates he was exposed to raw sewage that caused him to contract hepatitis A. McGhee first sought medical treatment on 26 August 2002, was diagnosed with hepatitis A on 30 August 2002, and was hospitalized on 2 September 2002. On 6 September 2002, McGhee underwent a liver transplant at Tulane Medical Center. It is undisputed that the transplant was medically necessary to save McGhee's life. Relying on the history given by McGhee, Dr. Frederic Regenstein, McGhee's treating physician, directly related the hepatitis A to his work and exposure to raw sewage.
As a result of the liver transplant, McGhee is forced to take a myriad of medications to prevent rejection of his transplanted liver, and is totally and permanently disabled from the work he was previously performing.
Drennan refused to pay any of McGhee's medical expenses that, at the time of trial, totaled over $400,000.00. In addition, Drennan has not paid any compensation benefits. However, during the months of March through August 2003, Drennan paid for McGhee's mandatory prescription medication. Drennan contends that McGhee's hepatitis A did not result from his employment, relying on his medical records and expert opinions that the incubation period between the alleged exposure and onset of symptoms was too brief.
McGhee filed a disputed claim for compensation on 8 November 2002 with the Office of Workers' Compensation, seeking benefits, medical expenses, and penalties *6 for Drennan's arbitrary and capricious decision to deny McGhee's claim. Drennan filed a timely answer, denying that McGhee sustained an injury within the course and scope of his employment or that he suffered from an occupational disease peculiar to his employment. The matter proceeded to trial on 1 October 2003 before a workers' compensation judge of District 8. Prior to trial, the parties stipulated that (1) McGhee was employed by Drennan in August 2002; (2) he was diagnosed with hepatitis A on 30 August 2002; (3) he suffered from acute liver failure requiring a liver transplant; (4) he remains disabled as a result of the transplant; and (5) all medical treatment received for the hepatitis A was necessary and related to his illness.
A judgment was rendered on 10 February 2004, wherein the court held that McGhee did not meet his burden of proving that his hepatitis A arose out of the course and scope of his employment. Consequently, the court denied McGhee's request for temporary total disability benefits, supplemental earnings benefits, medical bills and expenses, and penalties and attorney's fees.
On 19 February 2004, McGhee filed a motion for new trial based on newly discovered evidence. In support of the motion, McGhee filed his own affidavit stating that two former employees of Drennan, Byron Jones and Darnell Ellis ("Ellis"), came forward after the trial and offered to testify on McGhee's behalf. Of particular importance was to be the testimony of Byron Jones who would testify that he had worked with McGhee in the hole and was exposed to raw sewage on dates that contradict the testimony of the Drennan employees. McGhee also stated that Ellis would testify that some of the Drennan employees who appeared at trial were coerced to testify against him.
Drennan opposed the motion and the court heard the matter on 29 March 2004. On 14 April 2004, the motion for new trial was denied without reasons.
McGhee has set forth four assignments of error. First, he argues that his average weekly wage should be based on the presumption of fulltime employment. Second, he claims that the trial court erred in failing to find that his hepatitis A was related to his employment with Drennan. Third, he contends that the trial court erred by finding that Drennan was not arbitrary and capricious in denying all benefits. Finally, McGhee maintains that the trial should have granted the motion for new trial based on newly discovered evidence. Because we affirm the judgments of the trial court, we pretermit discussion of assignments one and three.
This is a fact-intensive case. Three doctors testified at trial: Dr. Regenstein and Dr. Harold Shelby, McGhee's treating physicians, and Drennan's expert witness, Dr. Warren Summer. The testimony of a second defense expert, Dr. Luis A. Balart, was submitted by deposition. All the doctors agreed about the basics of hepatitis A, the sources of infection, how the disease is spread, and its incubation period. We summarize this testimony below.
Hepatitis A is transmitted primarily through human contact or from contaminated material. It infects the gastrointestinal tract first as it is swallowed or eaten and then moves into the liver, the primary site of infection. Only about one percent of those who contract hepatitis A are not treatable with antibiotics; in fact, many people who contract the disease have mild or no symptoms, and clear the disease without treatment.
The median incubation period, which is the time between exposure to the virus and the onset of the initial symptoms, is 30 *7 days, with the range from about 10 to 50 days. The initial symptoms could be like a prodrome[1] with a slight fever, or simply not feeling well. These are followed by jaundice, where the individual will notice a yellow discoloration of the eyes, darkened coloration to the urine, and worsening feeling, sometimes with increased fever. In the laboratory, one would see elevated liver enzymes.
Dr. Balart testified that he had seen an older study where the incubation period was less than ten days when blood tainted with the hepatitis virus was transfused into babies in a pediatric intensive care unit. Several of the children who received the tainted blood contracted acute hepatitis A in seven or eight days. Dr. Balart opined that because the virus went directly into the bloodstream, the incubation period was less than is normally seen.
All of the doctors agreed that one could not relate the contraction of McGhee's hepatitis A to any exposure that occurred on 21 or 23 August 2002, when first exhibiting symptoms on 26 August 2002. However, if the exposure occurred on 1 or 2 August 2002, the doctors agreed that the incubation period would be consistent with a typical hepatitis A case.
The hepatitis A virus is transmitted by a variety of human contacts, which could be as innocent as touching a bathroom doorknob after one who has the virus or eating food prepared by someone with the virus who failed to properly wash his/her hands. Other persons at risk include workers at day care centers and nursery schools, restaurant workers who come into contact with contaminated seafood, and anyone who comes into contact with feces, such as sewage workers. Studies indicate that in urban populations, approximately 45% of the population is infected with the hepatitis A virus and are potential carriers to others, especially when many of the infected never exhibit symptoms of the virus.
The record reveals that, upon admission to Methodist Hospital on 31 August 2002, Dr. Shelby was asked to examine McGhee, who presented as quite ill and lethargic. Dr. Shelby asked him questions about the nature of his job, whether he had received any blood transfusions or tattoos, and seafood contact. When asked if he had eaten any seafood, McGhee replied that he had consumed oysters two to three weeks earlier. Dr. Shelby admitted that he could not vouch for McGhee's mental competence at the time or that he could vouch for the validity of McGhee's response.[2]
When questioned about his statement to Dr. Shelby, McGhee testified that he had never eaten raw oysters in his life, but occasionally ate smoked oysters from a can. McGhee's wife confirmed this testimony. Even Dr. Balart admitted that the medical records did not indicate if the seafood eaten by McGhee was raw or not.
At trial, McGhee testified that he was in the hole on 1 and 2 August 2002, at which time he was exposed to raw sewage. He also testified that he was exposed to raw sewage on 21 and 23 August 2002. He testified specifically that on 21 August 2002, while working in the hole, a sewage line backed up and when uncapped, raw sewage was thrown on his face, got in his mouth, and was ingested.
Albert Long ("Long"), the Drennan foreman on the Touro Street job, testified for the defense. On that job, he was sending *8 Darryl Cade, Robert Robinson ("Robinson"), and Henry Jones in to the "hole," beneath the street. On 1 August 2002, the second day working on the Touro Street job, they "tied into a sewage manhole," about 14 feet below the street. Long testified that Robinson and Henry Jones were in the hole on 1 August 2002 and that McGhee worked on the top; that he was sure that McGhee did not work in the hole. He also acknowledged that McGhee was on the Touro Street job the following day, at which time the crew was laying sewage pipe. Again, McGhee worked on top and not in the hole.
Long testified that the only day he remembers sending McGhee in the hole was on 21 August 2002. Henry Jones had called in sick and McGhee volunteered to work in the hole with Robinson.[3] However, McGhee never told him about the incident whereby raw sewage got into his mouth. He admitted, however, that workers in the "hole" beneath the street who work on sewer lines are sometimes exposed to raw sewage.
Robinson also testified for Drennan. He remembered working with McGhee on the Touro Street project. He said that he and his co-worker Henry Jones were the two on the crew who routinely worked in the hole. Robinson testified that Henry Jones was in the hole with him on 1 August 2002; he said that Long would not put an inexperienced person, such as McGhee, in a hole that deep.[4] Robinson could not recall if McGhee was in the hole with him on 2 August 2002, but testified that the only day McGhee worked in the hole with him was the day Henry Jones called in sick. When informed that Henry Jones called in sick on 21 August 2002, Robinson confirmed that 21 August 2002 was the only day McGhee worked in the hole with him.
Robinson was also unaware of any incident on the 21 August 2002 when McGhee testified that he ingested sewage. Robinson stated that if sewage had been thrown onto McGhee, it would have also been thrown onto him because he was ahead of the pipe. On cross examination, Robinson admitted that occasionally during the six or seven years laying pipe, he had been exposed to raw sewage, even while wearing the protective gear furnished by Drennan.
The trial court found that McGhee did not meet his burden of proving by a preponderance of the evidence that on 1, 2, 21, or 23 August 2002 he suffered a personal injury by accident, arising out of and in the course and scope of his employment. In a workers' compensation case, as in other cases, the appellate court's review is governed by the manifest error or clearly wrong standard. Freeman v. Poulan/Weed Eater, 93-1530 (La.1/14/94), 630 So.2d 733, 737 (citation omitted). Under this standard of review, an appellate court may not set aside a trial court's finding of fact in the absence of manifest error or unless it is clearly wrong. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). Even though an appellate court may feel its own evaluations and inferences are more reasonable than the factfinder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. Id. After reviewing the entire record, the appellate court must determine if the factfinder's conclusion was reasonable. Mart v. *9 Hill, 505 So.2d 1120, 1127 (La.1987). Where conflicting testimony exists, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed. Rosell, supra.
We have reviewed the evidence as outlined above. While McGhee testified that he was in the hole on 1 and 2 August 2002, no other witness confirms his testimony.[5] In fact, defense witnesses, Long and Robinson, were certain that the only day McGhee worked in the hole was 21 August 2002. Unfortunately for the plaintiff, it is undisputed that any exposure on this date could not have led to McGhee's symptoms on 26 August 2002, the first day he sought treatment. While we reject the possible "raw" oyster connection, we cannot find that the trial court erred in finding that McGhee's hepatitis A was not caused by or arose in the course and scope of his employment with Drennan.
The court is quite sympathetic towards this plaintiff. McGhee is a man in his early 30s with a wife and five children who, at the time of his illness, worked two jobs to support his family. Now, as a result of the liver transplant, he is totally and permanently disabled, has outstanding medical bills of over $400,000.00, and must take expensive anti-rejection drugs for the rest of his life. While the court might well have weighed the evidence differently if it were the trier of fact, we cannot say that the trial court's findings are unreasonable in light of the appellate record before us.
McGhee also argues that the trial court erred in denying his motion for new trial on the basis of newly discovered evidence pursuant to La. C.C.P. art.1972(2), which provides in pertinent part:
A new trial shall be granted, upon contradictory motion of any party, in the following cases:
* * *
(2) When the party has discovered, since the trial, evidence important to the cause, which he could not, with due diligence, have obtained before or during the trial.
This article requires a party seeking its benefit to demonstrate that it has done all that is reasonable to lead to timely discovery of the evidence. Barker v. Rust Engineering Co., 428 So.2d 391 (La.1983). Generally, the due diligence requirement is satisfied if the record indicates that the party seeking the new trial did "all that is reasonable" to discover the evidence before the end of the trial. Id. at 394. However, the movant is not required to do "all that is possible" to discover the evidence. Id. When it is doubtful if the newly discovered evidence could have been discovered with proper diligence, this doubt is resolved against granting a new trial. Woessner v. Park One, Inc., 01-1647, p. 9 (La.App. 4 Cir. 3/27/02), 815 So.2d 329, 334 (citing Pahnvitz v. Fassman, 2 La. Ann. 625, 1847 WL 3433 (La. 1847)). A trial judge has broad discretion in granting or denying a motion for new trial. The appellate standard of review of the ruling on a motion for new trial is whether the trial judge abused his discretion. Martin v. Heritage Manor South, 00-1023 (La.4/3/01), 784 So.2d 627.
In his memorandum in support of the motion, McGhee attached his affidavit, contending that since the trial, he learned that a former employee of Drennan, Byron Jones, was willing to testify that he had *10 worked in the hole with McGhee and could verify exposure to raw sewage on dates that contradicts the testimony of the Drennan employees. In addition, McGhee stated that a Drennan employee recently fired for refusing to work in the hole, Ellis, contacted him. Ellis told McGhee that he would testify to working conditions and exposure to raw sewage. In addition, Ellis told McGhee that the Drennan employees who testified at trial were coerced into doing so.
Drennan opposed the motion, arguing that the affidavit executed by McGhee contained inadmissible hearsay, and even if admissible, the evidence could have been discovered prior to trial with due diligence. In addition, Drennan pointed out that Byron Jones was out sick on 1 and 2 August 2002 and could not offer any credible evidence that McGhee was exposed to raw sewage on those days. The motion was denied without reasons.
We cannot say that the trial court abused its discretion by denying the motion for new trial. Surely if McGhee had worked in the hole with Byron Jones, this evidence cannot be "newly discovered." Even if Byron Jones had been reluctant to testify, McGhee could have taken his deposition and/or compelled his presence at trial.[6] In addition, McGhee testified that he was in the hole on 1 and 2 August 2002, which cannot be corroborated by Byron Jones because the time records demonstrate that he was not on the job on those two days.
As far as Ellis is concerned, if the affidavit were from Ellis himself, we might be concerned about the allegation that certain Drennan employees were coerced to testify against McGhee, giving, one would assume, false testimony. However, the affidavit is from McGhee, requiring that the trial court assess its credibility based on what he knew of McGhee at the trial on the merits. Again, we do not find that the trial court abused its discretion in rejecting the self-serving affidavit.
Based on the foregoing, we affirm the judgments of the trial court.
AFFIRMED.
NOTES
[1] "Prodrome" is a medical term for a symptom that indicates the impending outbreak of a disease.
[2] We note that Dr. Shelby did not ask McGhee whether he had eaten any raw seafood, just "any kind of seafood."
[3] The time records from Drennan indicate that Henry Jones was present on 1 and 2 August 2002.
[4] Robinson also testified that he would not want a "green man" in a hole that is 14-15 feet deep.
[5] In addition, assuming that McGhee worked on top on 1 and 2 August, no evidence was presented that McGhee touched equipment or pipes coming out of the hole such that would permit an inference that he contracted hepatitis A from contact with contaminated equipment.
[6] At the least, McGhee could have obtained Byron Jones' affidavit to append to his motion for new trial. If Byron Jones had been subpoenaed to testify at trial but did not appear, McGhee might be entitled to a new trial.