921 So.2d 145 (2005)
Martin N. SCIAMBRA, Nicole Burmaster and Casey Bourg
v.
JEROME IMPORTS, INC. d/b/a Honda Town and Wausau Insurance Company.
No. 2005-CA-0260.
Court of Appeal of Louisiana, Fourth Circuit.
December 14, 2005.
*147 Davy P. Laborde, Jr., Law Firm of Davy P. Laborde, New Orleans, LA, for Plaintiff/Appellant.
Kenneth B. Krobert, Law Offices of Marvin H. Olinde, Metairie, LA, for Defendant/Appellant.
(Court composed of Chief Judge JOAN BERNARD ARMSTRONG, Judge PATRICIA RIVET MURRAY and Judge MAX N. TOBIAS JR.).
JOAN BERNARD ARMSTRONG, Chief Judge.
Martin Sciambra ("the plaintiff"), Nicole Burmaster and Casey Bourg sued Jerome Imports, Inc., O/B/O Honda Town (Honda Town) and its insurer, Wausau Insurance Company, for damages allegedly sustained when a car driven by the plaintiff in which Burmaster and Bourg were passengers struck the rear of a van owned by the United States Immigration and Naturalization Service and operated by Hedwig Bohme.[1] The plaintiff claimed that Honda Town's defective repair of his vehicle's brakes caused the accident. Honda Town denied liability and, alternatively, claimed that the plaintiff was at fault because he knew or should have known of the problem yet continued to drive the car without seeking remediation of the defect.
Following trial, a jury found Honda Town liable to the extent of 60% and the plaintiff liable to the extent of 40%, and fixed damages at $58,000. The plaintiff moved for judgment notwithstanding the verdict (JNOV) as to both the division of liability and damages. The trial court denied the motion as to liability, but granted the motion, increasing the general damage award by $49,000.
Both the plaintiff and Honda Town appeal the trial court's judgment. Honda Town seeks reversal of the JNOV and the plaintiff seeks reversal of the jury's apportionment of liability and additional damages.
On January 23, 2001, the plaintiff brought his 1996 Honda Accord to Honda Town for correction of several problems, including the fact that the car's anti-lock braking system's (ABS) warning light had deployed. Grayling Guidry, the Honda Town employee who serviced the brake system, testified that he bled the brake lines to remove any air bubbles and otherwise *148 tested the operation of the braking system.
On February 6, 2001, eleven days after having picked up his car after this service, the brakes failed and the Accord ran into the government van, which was stopped for a stoplight at the intersection of Louisiana Highway 39 and Louisiana Highway 47 in Chalmette, Louisiana. The plaintiff and his passenger, Ms. Burmaster, were taken by ambulance to the Chalmette Medical Center's emergency room that night, and his other passenger, Mr. Bourg, later sought medical treatment.
Deputy Walter Dornan investigated the accident. The plaintiff told him that his brakes failed when he applied them, and the deputy's investigation revealed that the master brake cylinder was empty and the brake pedal went to the floor. The deputy made no other findings.
Following the accident, the Accord was taken to a body shop for repair, where manager Joe Talkington noted that the brake cylinder was empty. His testimony supported introduction of photographs of the cylinder at trial. Mr. Talkington sent the Accord to GT Automotive, where mechanic Wyatt Hartley was engaged to repair the brake system. Mr. Hartley testified that after having filled the system and started the bleeding procedure, he noticed brake fluid leaking from loose brake line couplings at the ABS unit. According to Mr. Hartley's testimony, after tightening the brake line couplings and bleeding the system, the brakes functioned properly. He testified that he determined that one of the six nuts connecting the brake lines to the master cylinder module was slightly loose and opined that the brake fluid was squeezed out of this fitting over the space of the eleven days that the plaintiff drove the Accord between the time of its repair by Honda Town and the accident. According to Mr. Hartley, the presence of some brake fluid in the system would allow the system to work at an acceptable level for some time, and he opined that the remaining brake fluid must have been expelled from the system when the plaintiff applied his brakes while approaching the scene of the accident.
Eric Babcock, an associate professor of automotive sciences at Delgado Community College, was accepted as an expert master mechanic in the field of auto mechanics. He testified without contradiction that, in his opinion, the most likely source of the loss of brake fluid was the loose fitting described by Mr. Hartley. He opined, however, that the Accord's braking system would not have undergone a sudden, absolute failure such as that described by the plaintiff and Mr. Hartley. According to the expert, the master brake cylinder has two pumping sections, typically one for the left front and right rear brakes, and one for the right front and left rear brakes. If the fluid drops all the way in the master cylinder, fluid remains in the half of the system that does not have a leak. When the fluid level drops, a sensing switch in the reservoir lights a red light in the dashboard indicating a serious brake problem. Once the fluid has dropped in the leaking half of the master cylinder, air gets in and the brake pedal lowers, but the car retains the ability to stop. According to Mr. Babcock, a slow leak would cause the fluid level to reduce, and under the pressure of heavy braking, the system would lose a drop or two of fluid with every braking maneuver. He opined that he knew of no circumstances under which a person could drive a car for ten or eleven days, and drive a thousand miles, and suddenly have the brakes lose all their pressure as the plaintiff claimed. Mr. Babcock discounted Mr. Hartley's theory that all of the brake fluid flowed out when the plaintiff attempted to brake the *149 Accord immediately prior to the accident. According to Mr. Babcock, such an event would have left obvious evidence of leaked brake fluid which would have been detected readily by Deputy Dornan.
The plaintiff admitted that he drove the Accord despite having noticed a peculiar smell that could have been brake fluid, and the continual lowering of the brake pedal several days before the accident. He called Honda Town on Thursday to report the problem, and was told to bring the car in on the following Monday. Nonetheless, he continued to drive the car, and the accident occurred during the intervening weekend.
Honda Town assigns as error the trial court's JNOV adding $49,000 to the jury's $26,000 general damage award for past and future physical pain.
The motion for a JNOV is controlled by La.C.C.P. art. 1811, which allows for JNOV on the issue of liability or on the issue of damages or on both issues. Clearly, there are limits on the discretion of a trial court to reform a jury verdict. The jurisprudence limits application of the JNOV doctrine to those cases where the jury's verdict is absolutely unsupported by any competent evidence. Boudreaux v. Schwegmann Giant Supermarkets, 585 So.2d 583, 586 (La.App. 4 Cir.1991). A JNOV is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the court believes that reasonable persons could not arrive at a contrary verdict, not merely when the trial court finds that there is a preponderance of the evidence in favor of the mover. Where there is evidence opposed to the motion of such quality and weight that reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions, the motion should be denied. Anderson v. New Orleans Public Service, Inc., 583 So.2d 829, 832 (La.1991); Andrews v. Dufour, 03-0736, p. 6 (La.App. 4 Cir. 6/2/04), 882 So.2d 15, 21. In making its determination, the trial court should not evaluate the credibility of the witnesses, and all reasonable inferences or factual questions should be resolved in favor of the non-moving party. Id.
It is well established that the determination of general damages is within the great, even vast, discretion of the trier of fact, in this case, the jury. The standard for appellate review of general damage awards is difficult to express and is necessarily non-specific, and the requirement of an articulated basis for disturbing such awards gives little guidance as to what articulation suffices to justify modification of a generous or stingy award. Nevertheless, the theme that emerges from the jurisprudence is that the discretion vested in the trier of fact is "great," and even vast, so that a general damage award should rarely be disturbed. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the award should be increased or reduced. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993), cert den. 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994).
Upon appellate review, this court uses the same criteria as the trial court in determining whether the trial court erred in granting the JNOV, i.e. whether the facts and inferences point so strongly and overwhelmingly in favor of the moving party that reasonable men could not arrive at a contrary verdict. In re Henderson, 04-0172, 04-0173, 04-0174, p. 4 (La.App. 4 Cir. 1/19/05), 895 So.2d 581, 583, citing Anderson, supra. This rigorous standard is based on the principle that when there is *150 a jury, the jury is the trier of fact. Trunk v. Medical Center of Louisiana at New Orleans, 04-0181, pp. 4-5 (La.10/19/04), 885 So.2d 534, 537. If that standard is not met, then the jury verdict must be reinstated. Id.
In the great mass of jurisprudence concerning the JNOV, our courts refer to the reasons, either oral or written, given by the trial courts in support of their actions either granting or denying motions for JNOV. In this case, the record contains no reasons for the JNOV.
We are guided by the principles set forth by the Louisiana Supreme Court in Martin v. Heritage Manor South Nursing Home, 00-1023, pp. 4-6 (La.4/3/01), 784 So.2d 627, 631-632. That case involved the appeal of the trial court's judgment granting a new trial, NOT a JNOV. The Supreme Court clarified the distinction between the standard of review of a JNOV and that of a judgment granting a new trial. The Supreme Court noted that in considering a motion for new trial, a trial court may evaluate the evidence without favoring either party and may draw its own inferences and conclusions, and evaluate witness credibility to decide if the jury had erred in giving too much credence to an unreliable witness. The court then held:
A motion for a new trial requires a less stringent test than for a JNOV as such a determination involves only a new trial and does not deprive the parties of their right to have all disputed issues resolved by a jury. "Although the language is similar between the standards for a JNOV and new trial, there is a real difference between a finding that no evidence existed for a rational jury to reach a particular result and a finding that a jury could not have reached its conclusion on any fair interpretation of the evidence." Notably, in considering whether the verdict was supported by any "fair interpretation of the evidence" on a motion for new trial, the trial judge is free to weigh the evidence and make credibility determinations and is not required to view the evidence in the light most favorable to the non-movant as on a JNOV motion.
In addition, as opposed to the granting of a motion for new trial on the grounds that the verdict is contrary to the evidence, which is directed squarely at the accuracy of the jury's factual determinations, noted federal procedural law commentators have stated that `whether the evidence presented at trial is sufficient to create an issue of fact for the jury or will permit the court to enter a judgment as a matter of law is solely a question of law. Charles Alan Wright and Arthur R. Miller, Federal Practice and Procedure, Vol. 9A, § 2524, p. 249 (West 1995). These commentators have further explained the differences between motions for a judgment as a matter of law and a new trial in that, while the trial judge has great discretion to determine whether the verdict is contrary to the law or the evidence on a motion for new trial, "[o]n a judgment as a matter of law, [the trial judge] has no discretion whatsoever and considers only the question of law whether there is sufficient evidence to raise a jury issue. Id. § 2531, p. 302. These same differences exist between a motion for a JNOV and a new trial under Louisiana law. [Citations and footnotes omitted.]
Martin, pp. 4-6, 784 So.2d at 631-632.
The court noted that even in the case of the motion for new trial, with its more lenient standard recognizing some discretion in the trial court, the "scales are clearly tilted in favor of the survival of the jury's verdict." Martin, at pp. 6-7, 784 So.2d at 632.
*151 Because the trial court in Martin had not given reasons for judgment granting the motion for new trial, the Supreme Court found it was required to examine all the evidence to determine whether the trial judge abused his discretion. In the case at bar, the trial court had no discretion, and the JNOV is justified only where, as a matter of law, and viewing the evidence in the light most favorable to Honda Town, it would have been impossible for a jury to have awarded general damages for past and future physical pain in the amount of $26,000. Stated another way, is there any factual basis for the jury's award, so as to defeat the motion for JNOV?
Dr. Stewart Altman, a medical doctor specializing in the treatment of soft tissue injuries, testified as the plaintiff's treating physician. According to the doctor's testimony, the plaintiff complained of immediate discomfort following the accident, and a few days later noted pain in his shoulders and lower back. Dr. Altman treated the plaintiff with Esgic for headache, Flexeril, a muscle relaxant, and subsequently Darvocet for pain. On March 27, April 17, May 3, June 5, June 26, July 17 and August 7, 2001 he prescribed Vicodin Extra Strength. He prescribed Soma, a muscle relaxer, on June 26 and July 17, and Ambien, a sleeping pill, on July 17. The plaintiff visited Dr. Altman's office for heat therapy on February 9 and March 6, 2001.
Dr. Altman last saw the plaintiff on August 28, 2001. At that time, he found that the plaintiff's range of motion in the lumbar spine was approximately fifty percent of normal, and that the plaintiff had palpable spasms. The notes of now-deceased orthopedist Dr. Kucharchuk reflected that doctor's recommendation of an MRI scan of the plaintiff's lumbar spine. Dr. Altman referred the plaintiff to Dr. Daniel Seltzer for this procedure.
On cross-examination, Dr. Altman testified that he normally recommends physical therapy, heat treatment and ultrasound to treat soft tissue injuries such as the plaintiff's. His treatment plan typically consists of a normal physical therapy regimen three times a week for the first two weeks of treatment and once a week thereafter. During the six and one-half months of treatment by Dr. Altman, the plaintiff appeared at the doctor's office only twice for physical therapy.
The plaintiff's medical billing from Dr. Altman's office shows office visits during 2001 on February 9, March 6 and 27, April 17, May 8, June 5 and 26, July 17, August 7 and 28. The doctor performed transcutaneous nerve stimulation at the February 9 and March 6 visits, and applied hot or cold backs at the March 6 visit. The statement also includes charges incurred on October 8, 2001 for preparation of medical and special reports. These charges total $820.00.
Dr. Seltzer, the plaintiff's orthopedic physician, testified that he was referred to him by plaintiff's counsel and Dr. Altman in 2001. He first saw the plaintiff on September 11, 2001 and found him to have normal gait, normal range of motion of the upper extremities, including shoulders, elbows, writs and hands. His head and neck were unremarkable, and his neurological exam of both upper extremities and thoracic spine (mid-back) were normal. The lower back showed moderate decreased range of motion without spasm, and tenderness over the sacroiliac region but not over the sciatic nerve. Straight leg raises and joints were normal. He took and reviewed X-rays that revealed a slight asymmetry of the vertebral bodies in the plaintiff's back, but no signs of fractures or notable conditions. He ordered an MRI, which was performed on September 21, 2001. The MRI showed a moderate herniation *152 of the L4-L5 disc (lumbar spine) without nerve involvement, and insignificant findings at L2-L3. Dr. Altman testified that normal treatment for the plaintiff's injury is conservative, failing which surgery could be considered. Conservative treatment consists of activity restrictions, medications and physical therapy. Surgery is a last resort, to be considered only if all other treatments were to fail. Dr. Altman generally is reluctant to recommend back surgery for young patients, like the plaintiff, as it can result in difficulties with respect to activity and employment. He opined that the plaintiff was in the category of persons who would get by without surgery, but that there was a low likelihood that he would be totally pain-free. He testified that it was not more likely than not that the plaintiff would require surgery eventually. The only activity restrictions he recommended were against lifting twenty-five or thirty pounds on a regular basis or fifty pounds on an individual basis and avoidance of contact sports. The plaintiff should also maintain his fitness level and avoid overweight. Dr. Altman did not recommend further physical therapy, and opined that he would need no more than perhaps three medical visits per year.
On cross-examination, Dr. Seltzer testified that he did not know that the plaintiff made only two physical therapy visits to Dr. Altman. He reviewed in detail the findings of the orthopedic examination, and noted that the plaintiff at no time complained of pain going down into his legs and demonstrated no signs of radiculopathy. He testified further that in the course of his treatment of the plaintiff he found no evidence at any time of any neurological deficit or nerve damage. Nerve damage would be an indication of a need for surgical intervention. Dr. Seltzer also identified and confirmed the information contained in his bill.
The plaintiff's medical billing from Dr. Seltzer's office showed charges for office visits on September 11, 2001, October 12, 2001, December 26, 2001, February 26, 2002, May 1, 2002, November 27, 2002, January 22, 2003, February 28, 2003, April 30, 2003, June 27, 2003, August 20, 2003, October 13, 2003, December 10, 2003 and January 20, 2004. Dr. Seltzer also charged "no show fees" on November 27, 2001, January 30, 2002, February 5, 2002, March 26,2002, June 5, 2002, July 1, 2002, July 16, 2002, August 21, 2002 and October 2, 2003. Dr. Seltzer testified that these "no show" fees related to appointments he had scheduled for the plaintiff which the plaintiff neither attended nor called to cancel or reschedule.
Dr. Lander L. Pearce's MRI report was admitted into evidence. According to Dr. Pearce's interpretation of the MRI:
There is mild hypertrophic spurring at L2-L3 and L4-L5. There is a mild disc narrowing at L2-L3 with moderate disc narrowing at L4-L5. There is evidence of minimal disc dehydration at L-2-L-3 with mild disc dehydration at L4-L5. There is evidence of mild diffuse disc bulging at L2-L3. There is a subligamentous central disc herniation at L4-L5. Consequently, there are anterior defects against the lumbar subarachnoid space at L2-L3 and L4-L5 secondary to the disc changes at these two levels. The lumbar subarachnoid space is otherwise unremarkable. The conus medullaris is normal. Neural foramina are patent bilaterally.
IMPRESSION::
1. Mild disc narrowing, minimal disc dehydration, with mild diffuse disc bulging at L2-L3.
2. Moderate disc narrowing, mild disc dehydration, with a subligamentous central disc herniation at L4-L5.
*153 Neither Dr. Altman nor Dr. Seltzer related these conditions to the accident that forms the basis of the instant litigation.
On the basis of the foregoing medical testimony, we find that the JNOV standard as announced in the Anderson and Martin cases was not met. There is no medical opinion in the record stating that the findings of a bulging or herniated disc were more likely than not caused by the accident in question. There is no testimony that it is more likely than not that the plaintiff will eventually require surgery. Indeed, Dr. Seltzer's testimony is to the contrary. There is evidence that the plaintiff's problem can be and has been resolved through medication and mild restriction of activity. There is no indication in the record that the pain the plaintiff suffered was not treated adequately by medication.
Although Dr. Altman testified to his regular treatment plan, consisting of physical therapy three times a week for the first two weeks of treatment and twice a week thereafter, it is uncontroverted that the plaintiff attended only two therapy appointments. Since there was no evidence that financial or other considerations prevented the plaintiff from complying with this schedule, the jury reasonably could infer that he was not in such pain that he was moved to cooperate in the prescribed therapy protocol. The jury also heard and viewed evidence that the plaintiff failed to attend nine of his twenty-three scheduled appointments with Dr. Seltzer. The implication again is reasonable that his pain was not so severe as to cause him to cooperate with the treatment plans of his treating physicians.
From the evidence adduced at trial, we cannot say that a reasonable jury could not have concluded that $26,000 was reasonable compensation for the plaintiff's past and present physical pain. For that reason, we find no basis in law or fact for the judgment notwithstanding the verdict in this case and conclude that Honda Town's assignment of error has merit. The judgment notwithstanding the verdict increasing the award of damages for past and present physical pain is reversed.
The plaintiff contends that the jury awards for past and future mental suffering, future medical expenses and permanent disability were unreasonable and inadequate.
The jury awarded the plaintiff $5,500 for past and future mental suffering. This general damage award is reviewed under the Youn standard discussed previously. In light of the evidence adduced at trial, we cannot say the jury abused its great, even vast, discretion in fixing the mental element of the plaintiff's general damages at $5,500. It is only if we were to find that this figure shocks the conscience and exceeds the jury's discretion that we should resort to a review of other awards made by other triers of fact on arguably similar facts. Having found no abuse of discretion, we are not called upon to determine the highest or lowest amount that could have been awarded to the plaintiff under the particular circumstances of this case. This assignment of error is without merit.
The plaintiff argues that because he incurred $3,500 in medical bills during the first three years following the accident, the jury was unreasonable in not having awarded him the approximate average annual medical expense for each year of his life expectancy. We note that the record does not contain expert opinion or a stipulation as to the plaintiff's life expectancy at the time of trial. The only testimony as to the requirement of future medical care is Dr. Seltzer's testimony that the plaintiff would be well served by seeing his orthopedist no more than three times a year. *154 Dr. Altman charged from $60 to $80 for each office visit. Dr. Seltzer, the orthopedist, charged between $45 and $50 per visit. Based on the evidence of record taken as a whole, including both the evidence of the maximum number and cost of the expected future office visits and the plaintiff's record of failing to attend scheduled appointments, the jury's award of $3,000 for future medical expense is reasonable and supported by the record evidence. Therefore, we find no manifest error in that portion of the jury's award.
The treating orthopedist described the plaintiff's activity restrictions, and they were minimal. Dr. Seltzer concluded that the plaintiff should not lift more than fifty pounds on any individual occasion and should not regularly lift twenty-five or thirty pounds. Furthermore, he should not play rough contact sorts such as football, basketball or roller skating, although the doctor opined that regular exercise to "stay in shape" would be advisable. Once again, the jury had the opportunity to witness the plaintiff at trial and to evaluate his disability in light of his testimony and that of his doctors, and the record of his medical treatment. There is no testimony that the plaintiff can no longer continue in his regular occupation and activities. From the record taken as a whole, we find no manifest error in the jury's award of $17,000 for permanent disability to this plaintiff under the particular facts of this case.
The plaintiff contends that the jury's apportionment of forty percent comparative fault to him was unreasonable and excessive. By analogy to the review of awards of damages for personal injuries, the jury is owed some deference in allocating fault, for the finding of percentages of fault pursuant to La.C.C. art. 2323 is also a factual determination. Clement v. Frey, 95-1119, p. 7 (La.1/16/96), 666 So.2d 607, 610. The jurisprudence has recognized an analogy between excessive or inadequate quantum determinations and excessive or inadequate fault percentage determinations. In both, the trier of fact, unlike the appellate court, has had the benefit of witnessing the entire trial and of reviewing first hand all the evidence. Only after the court of appeal finds a "clearly wrong" apportionment of fault, should it adjust the award, but only to the extent of lowering or raising it to the highest or lowest point respectively which is reasonably within the trial court's discretion. Clement, pp. 7-8, 666 So.2d at 610-611.
The Clement court set out the following factors that may influence the degree of fault assigned to the parties. (1) Whether the conduct resulted from inadvertence or involved an awareness of the danger: In this case, the plaintiff admitted that he was aware of a problem with his braking system as evidenced by a lowering of the brake pedal and suspicious odor. Honda Town's negligence consisted in having failed adequately to tighten a screw in conjunction with its original repair of the Accord's ABS. (2) How great a risk was created by the conduct: The risk that the brakes would not be effective in stopping the car. (3) The significance of what was sought by the conduct: The plaintiff offered no exigent circumstances to excuse his having ignored the lowering brake pedal and suspicious odor. Honda Town repaired an element essential to the safe operation of the Accord. (4) The capacities of the actor, whether superior or inferior: The Honda Town mechanics had the superior ability to repair the initial brake problem in a non-negligent manner. The plaintiff had the superior opportunity to take his car back to Honda Town when he noticed the suspicious odor and the fact that the brake pedal was lowering. (5) Any extenuating circumstances which *155 might require the actor to proceed in haste, without proper thought: There is no evidence of such circumstances relating either to Honda Town or to the plaintiff. (6) The relationship between the fault/negligent conduct and the harm to the plaintiff: Clearly, the evidence shows that the injuries the parties sustained were caused by the confluence of Honda Town's failure to tighten an ABS screw adequately and the plaintiff's failure timely to respond appropriately to the lowering brake pedal and suspicious odor. Clement, p. 8, 666 So.2d at 611.
The plaintiff contends that because the trial court, in a separate determination in the passengers' lawsuits, which were not tried to a jury, apportioned fault 85% to Honda Town and 15% to the plaintiff, that apportionment should control. However, the trial court denied the plaintiff's motion for JNOV based on this same claim, doubtless recognizing the well-settled principle that a jury verdict should not be disturbed merely because another trier of fact might reach a different conclusion on the basis of the same facts. See, Rosell v. ESCO, 549 So.2d 840 (La.1989). We therefore place no weight on the apportionment made in the companion cases.
Under the foregoing analysis, and applying the standard of review set forth in Clement, we find that the jury was manifestly incorrect in its determination that the accident was caused by Honda Town to the extent of 60% and by the plaintiff to the extent of 40%. We find that the highest proportion of fault that could be assessed to the plaintiff is 30%, and the lowest proportion of fault that could be assessed to Honda Town is 70%.
For the foregoing reasons, we reverse the judgment notwithstanding the verdict insofar as it increased the award for past and present physical suffering and apportion fault in the proportion of 30% to the plaintiff and 70% to Honda Town.
REVERSED IN PART, AFFIRMED IN PART AND RENDERED.
NOTES
[1] Bohme brought a separate suit subsequently consolidated with the instant suit, that was settled, together with the Burmaster and Bourg claims, prior to trial.