DANIEL L. DYSART, Judge.
| defendant, Ochsner Medical Center-Kenner (“Ochsner”), and Intervenor, Louisiana Patient’s Compensation Fund/ Louisiana Compensation Patient’s Compensation Fund Oversight Board (collectively, “LPCF”), appeal the judgment notwithstanding the verdict (“JNOV”) and conditional new trial rendered in favor of the plaintiff, Gina Corona. For the reasons that follow, we reverse the trial court’s JNOV and reinstate the judgment it rendered in accordance with the jury’s verdict.
PROCEDURAL BACKGROUND
This lawsuit has a rather complex history and raises several procedural issues; however, based on our finding that the trial court improperly granted a JNOV, warranting a reversal, we need not address all of those issues. The following is a brief summary of the procedural history of this case.
Plaintiff, Gina Corona, filed the instant medical malpractice lawsuit against her medical providers, Dr. Thaddeus L. Tea-ford and Ochsner.[1] Ms. Corona alleged 1 jjthat her providers were negligent in failing to timely detect her breast cancer which ultimately lead to her death. The case was tried to an Orleans Parish jury, which held in favor of the defendants, dismissing plaintiffs claim.[2] On May 29, 2012, the trial court entered judgment in conformity with the jury’s verdict.
Plaintiff timely filed a motion for JNOV, and alternatively, for new trial and alternatively, for mistrial. On June 29, 2012, the trial court denied Ms. Corona’s motion as to Dr. Teaford but granted a JNOV as to Ochsner, awarding $500,000.00 in damages. The trial court also granted a conditional new trial if the JNOV were to be reversed on appeal.[3]
*798 Ochsner filed a motion for suspensive appeal on July 7, 2012, which the trial court granted on July 17, 2012. In the meantime, on July 6, 2012, plaintiff moved for a new trial on the JNOV on the basis that the trial court’s judgment was insufficient because it failed to include medical expenses. On July 20, 2012, plaintiff thereafter moved to dismiss the trial court’s order of suspensive appeal granted to Ochsner.[4] After a hearing on the motions, the trial court issued a supplemental and amending judgment dated September 6, 2012, granting plaintiffs motion for new trial and increased plaintiffs damages award to include | ¡¡medical expenses, for a total judgment of $ 1,058,000. Ochsner then took a suspensive appeal of this judgment.[5]
On September 19, 2012, the trial court issued another judgment, sua sponte, by which it vacated the July 17, 2012 order of appeal and granted Ochsner an appeal of the September 6, 2012 judgment. This appeal was consolidated with the June 29, 2012 appeal.
The LPCF intervened in this matter on September 24, 2012, and appealed the September 6, 2012 judgment. The LPCF filed a second Petition for Intervention in this Court, seeking to appeal the trial court’s June 29, 2012 judgment, in the event that the September 6, 2012 judgment is without effect. Ochsner, too, filed another motion for suspensive appeal (out of an abundance of caution) on September 25, 2012. Plaintiff then filed another answer to Ochsner’s motion for appeal, along with a cross-appeal on October 4, 2012, raising the same issues noted in footnote 4, above.
JUDGMENT UNDER REVIEW
As noted, this case has a complicated procedural history, with numerous motions for appeal and answers to the various motions for appeal. While we find that the trial court’s JNOV was erroneously entered, we must address whether Ochsner’s initial appeal of the JNOV divested the trial court of jurisdiction so that all subsequent pleadings and judgments are without effect. We do so only because |4a resolution of this issue determines whether we address the merits of plaintiffs argument concerning the trial court’s failure to grant a JNOV or motion for new trial as to Dr. Teaford. This issue turns on whether plaintiffs cross-appeal, filed only after Ochsner filed its September 25, 2012 motion for appeal, is timely. We conclude that it was not, as plaintiffs motion for new trial on the JNOV was not a procedurally recognized pleading.
Under La. C.C. Pr. art. 1811(D), the only party who may move for a new trial after a JNOV has been granted is “[t]he party whose verdict has been set aside.” There is no procedure by which *799 the party in whose favor a JNOV is granted may move for a new trial. Accordingly, plaintiffs July 6, 2012 motion for new trial on the JNOV has no legal effect, and the trial court’s July 17, 2012 order of suspen-sive appeal divested the trial court of jurisdiction. La. C.C. Pr. art.2088 provides, in pertinent part, that “[t]he jurisdiction of the trial court over all matters in the case reviewable under the appeal is divested, and that of the appellate court attaches, on the granting of the order of appeal.” Thereafter, the trial court retains jurisdiction “only over those matters not reviewable under the appeal.” Id. Article 2088 lists the types of matters over which the trial court continues to have jurisdiction after an order of appeal, none of which apply to this case.[6]
1 jjThe judgment under consideration in this appeal, therefore, is the June 29, 2012 judgment. While plaintiff answered Oehs-ner’s motions for appeal (see footnotes 4 and 5), plaintiff did not file a separate appeal of the trial court’s denial of the motion for JNOV and/or new trial as to Dr. Teaford. Under La. C.C. Pr. art. 2183(A), an answer to an appeal is “equivalent to an appeal on his part from any portion of the judgment rendered against him in favor of the appellant and of which he complains in his answer.” (Emphasis added). Plaintiffs answer “does not have the effect of an appeal as to any portion of the judgment rendered either in favor of, or against, a party who has not appealed.” Francois v. Ybarzabal, 483 So.2d 602, 605 (La.1986). As Dr. Teaford is not an appellant in this case, an answer to Ochsner’s appeal is ineffective in preserving for appeal any issue concerning the trial court’s denial of the motion for JNOV and/or new trial as to Dr. Teaford. Accordingly, those issues are not properly before us.
FACTUAL BACKGROUND
Certain facts are clearly not in dispute by any of the parties. On December 27, 2006, Gina Corona underwent a mammogram at Ochsner Medical Center-Kenner. She had a medical history which included numerous screening mammograms, starting as early as 1994. In 2003, she had a mammogram at Kenner Regional Medical Center (“Kenner Regional,” the predecessor to Ochsner-Kenner). Her referring physician was her gynecologist, Dr. Louise Collins. The reviewing radiologist noted extremely dense breasts “which can mask underlying iJesions.” There was no sign of malignancy and a repeat study was recommended in one year.
In November 2004, Ms. Corona underwent a routine screening mammogram again ordered by Dr. Collins. The mammogram was reviewed by a radiologist who noted that there were no suspicious masses; however, the study was significantly reduced due to the density of Ms. Corona’s breasts. Another routine screen *800 ing was recommended for the following year.
Ms. Corona’s next mammogram was on October 24, 2005, and was again performed at Kenner Regional. The radiologist noted an area of concern and two days later, on October 26, 2005, a bilateral ultrasound was performed which detected cysts in both breasts, which the reviewing radiologist felt were benign. However, the radiologist recommended further testing on a particular nodule in the left breast. A needle aspiration biopsy was performed which was negative for malignancy.
Ms. Corona then underwent the mammogram at issue in this lawsuit on December 27, 2006, again with Dr. Collins as her referring physician. In attendance was Sandy Wells, who performed the mammogram, and Deanna Nettles, the supervisor of breast imaging at Tansey Breast Center at Ochsner. Ms. Nettles was present at the request of her supervisor who asked that she observe the mammography procedures at the Kenner facility, which Ochs-ner had recently acquired. Two sets of films were taken that date; one was determined to be of inferior quality, and a second set was taken.
|7The mammogram study was reviewed by Dr. Teaford who issued a report noting that he had compared it with prior imaging studies. His evaluated the mammogram films to reflect heterogeneously dense breast tissue, with benign-negative findings. As with prior reports, Dr. Teaford felt that the density of Ms. Corona’s breast tissue lowered the sensitivity of the study and he recommended a repeat mammogram in one year. Dr. Teaford issued a standard letter to Ms. Corona regarding his findings, recommending that she maintain monthly self-examinations, advising that she should not ignore lumps and further advising that she should contact her physician if she discovered a lump or other change.
On May 9, 2007, Ms. Corona, away on a business trip, contacted Dr. Collins’ office and reported that she felt a solid mass in her left breast. Dr. Collins examined Ms. Corona on May 18, 2007, at which time Dr. Collins recommended that she see a surgeon. Ms. Corona underwent a biopsy on May 21, 2007, which was positive for infiltrating ductal cell carcinoma, an aggressive form of breast cancer. She underwent a left modified radical mastectomy on May 24, 2007, and then began a course of chemotherapy. Despite treatment over the years, including chemotherapy, radiation, a preventive hysterectomy and the removal of Ms. Corona’s right breast, her cancer recurred after several years of remission and caused Ms. Corona’s ultimate demise.
There is no real dispute that, had Ms. Corona undergone a diagnostic mammogram, rather than a screening mammogram, at her December 26, 2006 appointment at Ochsner, the cancer would have been discovered at that time. [¡¡Thus, the salient issue in this case is whether, during the December 26, 2006 examination, a diagnostic mammogram should have been performed. The jury, finding no fault on either Ochsner or Dr. Teaford’s part, clearly considered all of the evidence presented and concluded that, at the time of the mammogram, there was no indication for a diagnostic mammogram.
STANDARD OF REVIEW
While La. C.C. Pr. art. 1811 governs JNOVs, it sets forth no grounds for or criteria by which a JNOV may be granted. Our jurisprudence, though, clearly establishes the guidelines for when a trial court may properly grant a JNOV. Our Supreme Court reiterated that criteria in Lawson v. Mitsubishi Motor Sales of America, Inc., 05-0257, pp. 24-25 *801 (La.9/6/06), 938 So.2d 35, 52, citing Davis v. Wal-Mart Stores, Inc., 00-0445, pp. 4-5 (La.11/28/00), 774 So.2d 84, 89 as follows:
The standard to be used in determining whether a JNOV has been properly granted has been set forth in our jurisprudence as follows:
A JNOV is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the court believes that reasonable jurors could not arrive at a contrary verdict. The motion should be granted only when the evidence points so strongly in favor of the moving party that reasonable men could not reach different conclusions, not merely when there is a preponderance of evidence for the mover. If there is evidence opposed to the motion which is of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motion should be denied. In making this determination, the court should not evaluate the credibility of the witnesses and all reasonable [¡¡inferences or factual questions should be resolved in favor of the non-moving party. (Emphasis in original; citations omitted).
In reviewing a JNOV, an appellate court must determine “whether the trial judge erred in granting the JNOV by using the aforementioned criteria in the same way as the trial judge in deciding whether to grant the motion.” VaSalle v. Wal-Mart Stores, Inc., 01-0462, pp. 11-12 (La.11/28/01), 801 So.2d 331, 339. (Citations omitted). That is, “the appellate court must determine whether the ‘facts and inferences point so strongly and overwhelmingly in favor of the moving party that reasonable persons could not arrive at a contrary verdict.’ ” Id., p. 12, 801 So.2d at 339. If the appellate court determines that reasonable persons might reach a different conclusion, then the district judge erred in granting the motion and the jury verdict should be reinstated. Id.
Our jurisprudence limits the application of the JNOV doctrine to those cases where the jury’s verdict is absolutely unsupported by any competent evidence. Cattles v. Allstate Ins. Co., 09-1576, pp. 6-7 (La.App. 4 Cir. 8/4/10), 45 So.3d 627, 631, writ denied, 10-2353 (La.12/10/10), 51 So.3d 733, citing Sciambra v. Jerome Imports, Inc., 05-0260, p. 5 (La.App. 4 Cir. 12/14/05), 921 So.2d 145, 149; Boudreaux v. Schwegmann Giant Supermarkets, 585 So.2d 583, 586 (La.App. 4th Cir.1991). Likewise, “a trial court may not weigh the evidence, pass on credibility of witnesses or substitute its own judgment for that of the jury” when deciding a motion for JNOV. Boudreaux supra at 585, citing Hutchinson v. Wal-Mart, 573 So.2d 1148, 1151 (La.App. 1st Cir.1990).
^DISCUSSION
Judgment notwithstanding the verdict
In the instant matter, the trial court granted a JNOV, finding in its Reasons for Judgment that the “jury was clearly wrong in its verdict in favor of [Ochsner].” It further “deliberately [put] aside any judgment of credibility, and simply [found] that the jury failed to ascertain the one reasonable conclusion as to what actually transpired on that fateful morning of December 27, 2006.” In making these conclusions, the trial court made factual findings based solely on the testimony favorable to plaintiff and disregarding any contradictory testimony. For example, the trial court made the factual finding that plaintiff complained of discomfort in her left breast at the examination, which “would have triggered a request by the attendant to convert to a diagnostic mam *802 mogram, versus the screening mammogram ordered by [plaintiffs] referring physician. However, this request from the Ochsner technicians was never made.” It also made the factual finding that there was chaos at the examination and that “Ms. Wells was significantly more focused on Ms. Nettles’ review of her capabilities and Ms. Nettles was more focused on supervising Ms. Wells. The testimony bore out the fact that [plaintiff] was nothing more than a prop for Ochsner procedures than a patient that day.” The trial court further made the factual finding that “at the mammogram [plaintiffs] nipple was inverted” which “should have triggered the Ochsner technicians to request a diagnostic mammogram.”
While the trial court’s factual conclusions are one view of the evidence adduced at trial, they are not the only view of the evidence, as the trial court suggests. The record does not demonstrate that the jury’s verdict was absolutely unsupported by any competent evidence. See: Sciambra, supra. The jury, hearing | nthe same evidence as the trial court, simply reached different factual conclusions which are also supported by the record.
Again, the case turns on what occurred at plaintiffs December 27, 2006 appointment, as those events determined whether plaintiff underwent a screening mammogram or a diagnostic mammogram. There is no dispute that plaintiffs ob/gyn, Dr. Collins, referred her for a screening mammogram as Dr. Teaford’s December 28, 2006 report notes the “Reason” for the mammogram to be “Screening.” Plaintiffs own expert, Dr. Robert Hurwitz, agreed that, absent complaints of hardness or discomfort at the time of the mammogram, a screening mammogram would have been appropriate.
The jury heard testimony about the December 27, 2006 mammogram from three witnesses: plaintiff, Sandy Wells and Deanna Nettles. Plaintiff testified that, on the morning of her mammogram, she told the technician that her breast felt uncomfortable and hard. When asked whether she repeated her complaint, she indicated that she “just said it one time.” She “[couldn’t] recall” if they were “in a position to listen to [her] or to hear [her] when she said that.” Rather, she “assumed” that they did.
Neither Ms. Wells nor Ms. Nettles had specific recollections of plaintiff, given that they testified more than five years after the mammogram. However, they both testified that, had plaintiff voiced complaints about her left breast, they would have recorded those complaints and requested that plaintiffs screening mammogram be converted to a diagnostic mammogram.
Ms. Nettles testified that, while she had no independent recollection of plaintiff, on that date, her purpose was to “observe how [the Kenner facility] did their mammogram so that we would have consistency across.” When asked if she l^was in a position to hear the discussion between Ms. Wells and plaintiff, she testified that she “made sure that [she] positioned herself to where [she] could follow what she was saying.” In her experience, having performed “approximately 20,000” mammograms, Ms. Nettles has never “proceeded with a screening mammogram after a patient reported a complaint in [her] breast.” Likewise, she agreed that, “on a daily basis[, she] received complaints from patients and converged] [the mammogram] to a diagnostic [mammogram].” She had no reason “that that would not have been done for plaintiff.”
Ms. Wells, too, testified that, had plaintiff reported any complaints on the morning of her mammogram, she would have taken steps to ensure that her screening *803 mammogram was converted to a diagnostic mammogram. She indicated that, on a daily basis, she encounters patients with complaints and she has screening mammograms converted to diagnostic mammograms.
At the time of plaintiffs mammogram, Ms. Wells’ general practice was to verify the type of mammogram ordered (in this case, a screening mammogram) and then go through the patient’s history, noting any complaints or problems. She typically asked patients if they had any lumps. When she went over a patient’s questionnaire and history, she was “face-to-face” at a counter and “about a foot way from” the patient. Ms. Wells testified that she had been in a position to hear anything plaintiff would have told her.
After our thorough review of the record, we do not find that the facts and inferences point so strongly and overwhelmingly in favor of plaintiff or that reasonable jurors could have arrived at only one verdict, as the trial court found. We further find that the trial court improperly substituted its own judgment for that of the jury. We therefore conclude that the trial court erred in granting a JNOV.
[^Conditional new trial
As noted, the trial court denied plaintiffs motion for new trial; however, it conditionally granted a new trial as to Ochsner under La. C.C. Pr. art 1811(C)(1), which provides as follows:
If the motion for a judgment notwithstanding the verdict is granted, the court shall also rule on the motion for a new trial, if any, by determining whether it should be granted if the judgment is thereafter vacated or reversed and shall specify the grounds for granting or denying the motion for a new trial. If the motion for the new trial is thus conditionally granted, the order thereon does not affect the finality of the judgment.
In accordance with this Article, the trial court specified the following reasons as to conditionally granting a new trial to Ochs-ner:
The Court finds the first factor (of Article 1972; “a new trial shall be granted ... when the verdict or judgment appears clearly contrary to the law and evidence”) to be the most relevant, as the jury’s verdict regarding Ochsner Medical Center — Kenner is clearly contrary to the law and evidence presented during trial.
In Lawson, supra, pp. 28-29, 938 So.2d at 54-55 (Emphasis in original; citations omitted), the Louisiana Supreme Court discussed the trial court’s role in ruling on a motion new trial:
In a motion for new trial under either La.Code Civ. Proc. arts.1972 or 1973, the trial court may evaluate the evidence without favoring either party; it may draw its own inferences and conclusions; and evaluate witness credibility to determine whether the jury had erred in giving too much credence to an unreliable witness. The applicable standard of review in such matter is whether the trial court abused its discretion.
⅜ ⅜ ⅜ ⅜ ⅝
A conditional grant of a new trial is not to be used to give the losing party a second bite at the apple without facts supporting a miscarriage of justice that would otherwise occur.
li4Our jurisprudence reflects that, where a jury’s verdict is “reasonable in light of the evidence presented,” the moving party is not entitled to a new trial. Trunk v. Medical Center of Louisiana at New Orleans, 04-0181, p. 11 (La.10/19/04), 885 So.2d 534, 540. See also: In re Gramercy Plant Explosion at Kaiser, 04-1151 *804 to 04-1191 (La.App. 5 Cir. 3/28/06), 927 So.2d 492, Davis, supra, p. 12, 774 So.2d at 95 (“[b]ased on the facts in this case, we find no peremptory or discretionary grounds on which the trial court could have based its conditional grant of a new trial. The jury’s verdict was supportable by a fair interpretation of the evidence. We find no good ground for the granting of a new trial and find there would have been no miscarriage of justice in allowing the jury’s verdict to stand. Therefore, we hold that the granting of the motion for new trial was unwarranted”).
In this matter, we have already determined that the jury’s verdict was reasonable in light of the evidence presented. Accordingly, we find that plaintiff is not entitled to a conditional new trial and the trial court abused its discretion in granting plaintiffs motion for new trial.
CONCLUSION
For the reasons set forth herein, the judgment of the trial court is reversed and the jury’s verdict is reinstated.
REVERSED. VERDICT REINSTATED.

. Ms. Corona died after the trial and Charles Corona, Jr., Anne Vicari Corona and the Estate of Gina Lynn Corona were substituted as parties plaintiff. They will collectively be referred to herein as "plaintiff” or by the pronoun "she.”

. The jury Interrogatories reflect that the jury voted 12-0 in Dr. Teaford’s favor and 11-1 in Ochsner’s favor.

.The motion for new trial was also denied as to both defendants. On appeal, while plaintiff cites La. C.C.Pr. art.1972 and case law regarding the grant of a new trial, plaintiff failed to fully address this issue on appeal and seems to suggest that, under Article 1972, she is entitled to a new trial on the basis that the jury’s verdict "appears clearly contrary to the law and the evidence.” As plaintiff was granted a JNOV, and she cites no other basis *798 for a new trial under Article 1972, we find no merit to her implicit argument that the trial court erred in failing to grant her a new trial. We address the merits of the trial court's grant of a conditional new trial as to Ochsner later in this opinion.

. Plaintiff also filed an Answer to Ochsner's Motion for Appeal, raising several issues: that the trial court erred in failing to grant the JNOV as to Dr. Teaford; that the trial court erred in failing to grant a new trial against Dr. Teaford; and that the trial court erred in failing to award past medical expenses.

. Ochsner takes the position that its appeal was unnecessary for two reasons: (1) because the trial court’s September 6, 2012 judgment is null as there is no procedural basis for a motion for new trial on a JNOV and (2) because the trial court no longer had jurisdiction over the matter as jurisdiction vested with the appellate court once Ochsner was granted the order of appeal on the June 29, 2012 judgment. Plaintiff answered this appeal as well, raising the first two issues noted in footnote 4, above.

. Those matters include the right to: (1) Allow the taking of a deposition, as provided in Article 1433; (2) Extend the return day of the appeal, as provided in Article 2125; (3) Make, or permit the making of, a written narrative of the facts of the case, as provided in Article 2131; (4) Correct any misstatement, irregularity, informality, or omission of the trial record, as provided in Article 2132; (5) Test the solvency of the surety on the appeal bond as of the date of its filing or subsequently, consider objections to the form, substance, and sufficiency of the appeal bond, and permit the curing thereof, as provided in Articles 5123, 5124, and 5126; (6) Grant an appeal to another party; (7) Execute or give effect to the judgment when its execution or effect is not suspended by the appeal; (8) Enter orders permitting the deposit of sums of money within the meaning of Article 4658 of this Code; (9) Impose the penalties provided by Article 2126, or dismiss the appeal, when the appellant fails to timely pay the estimated costs or the difference between the estimated costs and the actual costs of the appeal; or (10) Set and tax costs and expert witness fees.